No. 23-1305

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

UNITED STATES EX REL. MARTIN FLANAGAN,

Plaintiff-Appellant,

v.

FRESENIUS MEDICAL CARE HOLDINGS, INC., d/b/a Fresenius Medical Care
North America,

Defendant-Appellee.

On Appeal from the United States District Court for the District of Massachusetts
in Case No. 1:21-cv-11627-FDS, Judge F. Dennis Saylor, IV

**OPENING BRIEF OF PLAINTIFF-APPELLANT MARTIN FLANAGAN**

Jamie Michele Bennett
BENNETT LAW
8 Creek Side Ct.
Middle River, MD 21220

Christopher P. Sullivan
Pamela E. Berman
ROBINS KAPLAN LLP
800 Boylston Street, Suite 2500
Boston, MA 02199

W. Scott Simmer
Noah M. Rich
BARON & BUDD, P.C.
600 New Hampshire Ave., NW
10th Floor
Washington, DC 20037
(202) 333-4562

# TABLE OF CONTENTS

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...................................VIII

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE..............................................................1

    A.    Statutory Background...........................................................2

    B.    Factual Background..............................................................3

        1.    Below-Cost Hospital Contracts....................................5

        2.    Medical Directors Paid Above Fair Market Value ....................8

        3.    Allegations Relating To Specific Referrals Resulting From the Kickback Scheme And Government Payment.........................10

    C.    The District Court's Dismissal of the Complaint................................13

    D.    The District Court's Denial of Leave to Amend.................................15

SUMMARY OF THE ARGUMENT .....................................................16

STANDARD OF REVIEW .................................................................17

ARGUMENT ..................................................................................18

I.    THE DISTRICT COURT ERRED IN DISMISSING RELATOR'S COMPLAINT. ...............................................................................18

    A.    The Complaint Satisfies Rule 9(b) For Claims Brought Under Section 3729(a)(1)(A) ....................................................................18

    B.    The Complaint Satisfies Rule 9(b) As It Applies To Claims Brought Under Section 3729(a)(1)(B) ..............................................31

i

C.     The District Court Erred In Its Application Of *Duxbury* To Indirect Medicaid Claims..................................................................................39

D.     The District Court Erred In Its Application Of A "But For" Causation Standard To Relator's Complaint.........................................................41

II.    AT A MINIMUM, THIS COURT SHOULD REVERSE THE DISTRICT COURT'S ORDER DENYING LEAVE TO AMEND. ...............................45

CONCLUSION .......................................................................................52

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT..................54

CERTIFICATE OF SERVICE ..................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008)................................................................48

*Acosta-Mestre v. Hilton Int'l of P.R., Inc.*,
   156 F.3d 49 (1st Cir. 1998)................................................................46

*Amyndas Pharms., S.A. v. Zealand Pharma A/S*,
   48 F.4th 18 (1st Cir. 2022)..........................................................*passim*

*City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*,
   857 F.3d 34 (1st Cir. 2017)................................................................50

*D'Agostino v. ev3, Inc.*,
   845 F.3d 1 (1st Cir. 2016)..................................................................30

*Foman v. Davis*,
   371 U.S. 178 (1962)..................................................................52, 53

*Frese v. Formella*,
   53 F.4th 1 (1st Cir. 2022)..................................................................27

*Guilfoile v. Shields*,
   913 F.3d 178 (1st Cir. 2019)........................................................*passim*

*Hagerty ex rel. U.S. v. Cyberonics, Inc.*,
   844 F.3d 26 (1st Cir. 2016)................................................................46

*Hayes v. New Eng. Millwork Distribs., Inc.*,
   602 F.2d 15 (1st Cir. 1979)................................................................46

*Heller v. Guardian Pharmacy*,
   521 F. Supp. 3d 1254 (N.D. Ga. 2021)..............................................43

*Hopper v. Solvay Pharms., Inc.*,
   588 F.3d 1318 (11th Cir. 2009) ........................................................32

*In re Genzyme Corp. Sec. Litig.*,
   754 F.3d 31 (1st Cir. 2014)................................................................45

*In re Lombardo*,
   755 F.3d 1 (1st Cir. 2014)................................................................48

*Kay v. N.H. Democratic Party*,
   821 F.2d 31 (1st Cir. 1987)................................................................51

*Klunder v. Brown Univ.*,
   778 F.3d 24 (1st Cir. 2015)............................................................46, 47

*Kuzma v. N. Ariz. Healthcare Corp.*,
   607 F. Supp. 3d 942 (D. Ariz. 2022) ................................................43

*LaRocca v. Borden, Inc.*,
   276 F.3d 22 (1st Cir. 2009)................................................................47

*Lawton ex rel. U.S. v. Takeda Pharm. Co.*
   842 F.3d 125 (1st Cir. 2016)...........................................................30, 31

*Mullin v. Balicki*,
   875 F.3d 140 (3d Cir. 2017) ...........................................................49

*New Eng. Data Servs., Inc. v. Becher*,
   829 F.2d 286 (1st Cir. 1987)...........................................................50

*Nikitine v. Wilmington Tr. Co.*,
   715 F.3d 388 (1st Cir. 2013)...........................................................52

*Palmer v. Champion Mortg.*,
   465 F.3d 24 (1st Cir. 2006)..............................................................48

*Quaker State Oil Ref. Corp. v. Garrity Oil Co.*,
   884 F.2d 1510 (1st Cir. 1989)..........................................................46

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012)..............................................................27

*United States v. Bay State Ambulance*,
   874 F.2d 20 (1st Cir. 1989)..............................................................44

iv

*United States v. Millenium Lab'ys, Inc.*,
  923 F.3d 240 (1st Cir. 2019)...............................................................44

*United States v. Teva Pharm.*,
  Civ. No. 20-11548 (D. Mass. July 14, 2023)......................................43

*U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*,
  No. 05-279 WJ/WDS, 2010 WL 11431465 (D.N.M. July 7, 2010)..................34

*U.S. ex rel. Bawduniak v. Biogen Idec, Inc.*,
  No. 12-CV-10601-IT, 2018 WL 1996829 (D. Mass. Apr. 27, 2018) ...............42

*U.S. ex rel. Booker v. Pfizer, Inc.*,
  847 F.3d 52 (1st Cir. 2017).........................................................19, 30

*U.S. ex rel. Cairns v. D.S. Med., LLC*,
  42 F.4th 828 (8th Cir. 2022) ...........................................................43

*U.S. ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*,
  865 F.3d 71 (2d Cir. 2017) ....................................................21, 37, 40

*U.S. ex rel. Colquitt v. Abbott Lab'ys*,
  858 F.3d 365 (5th Cir. 2017) ...........................................................31

*U.S. ex rel. Craschini v. Ahold USA Inc.*,
  282 F.R.D. 27 (D. Mass. 2012).........................................................33

*U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*,
  579 F.3d 13 (1st Cir. 2009)......................................................*passim*

*U.S. ex rel. Escobar v. Universal Health Servs., Inc.*,
  780 F.3d 504 (1st Cir. 2015)....................................................*passim*

*U.S. ex rel. Fitzer v. Allergan, Inc.*,
  No. 1:17-CV-00668-SAG, 2022 WL 3599139 (D. Md. Aug. 23, 2022) ...........42

*U.S. ex rel. Frazier v. Iasis Healthcare Corp.*,
  392 F. App'x 535 (9th Cir. 2010).....................................................52

*U.S. ex rel. Gagne v. City of Worcester*,
  565 F.3d 40 (1st Cir. 2009)......................................................*passim*

*U.S. ex rel. Ge v. Takeda Pharm. Co.*,
  737 F.3d 116 (1st Cir. 2013) ..................................................................17, 31, 50

*U.S. ex rel. Greenfield v. Medco Health Sols., Inc.*,
  880 F.3d 89 (3d Cir. 2018) ........................................................................28, 42

*U.S. ex rel. Grubbs v. Kanneganti*,
  565 F.3d 180 (5th Cir. 2009) ............................................................19, 21, 38, 41

*U.S. ex rel. Herman v. Coloplast Corp.*,
  No. CV 11-12131-RWZ, 2016 WL 4483869 (D. Mass. Aug. 24, 2016)...........32

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
  360 F.3d 220 (1st Cir. 2004)......................................................................*passim*

*U.S. ex. rel. Kelly v. Novartis Pharms. Corp.*,
  827 F.3d 5 (1st Cir. 2016)......................................................................30, 39, 40

*U.S. ex rel. Kester v. Novartis Pharms. Corp.*,
  41 F. Supp. 3d 323 (S.D.N.Y. 2014) ...............................................................43

*U.S. ex rel. Martin v. Hathaway*,
  63 F.4th 1043 (6th Cir. 2023) ..........................................................................44

*U.S. ex rel. Mastej v. Health Mgmt. Assocs. Inc.*,
  No. 2:11-cv-89-FtM-29 DNF, 2013 WL 1149255
  (M.D. Fla. Mar. 19, 2013)...............................................................................33

*U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc.*,
  865 F.3d 29 (1st Cir. 2017)........................................................................*passim*

*U.S. ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*,
  707 F.3d 451 (4th Cir. 2013) ...........................................................................41

*U.S. ex rel. Patel v. GE Healthcare, Inc.*,
  No. 8:14-cv-120-T-33TGW, 2017 WL 4310263 (M.D. Fla. Sept. 28, 2017)....33

*U.S. ex rel. Phalp v. Lincare Holdings, Inc.*,
  857 F.3d 1148 (11th Cir. 2017) .......................................................................33

*U.S. ex rel. Rost v. Pfizer, Inc.*,
  507 F.3d 720 (1st Cir. 2007).................................................................19, 31, 39

*U.S. ex rel. Tran v. Computer Scis. Corp.*,
   53 F. Supp. 3d 104 (D.D.C. 2014) ................................................................33, 34

*U.S. ex rel. Westmoreland v. Amgen, Inc.*,
   738 F. Supp. 2d 267 (D. Mass. 2010) ..........................................................21, 31

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
   208 F.3d 288 (1st Cir. 2000) ........................................................................18, 47

**Statutes**

28 U.S.C. § 1331 ..................................................................................................1

31 U.S.C. § 3729 ..........................................................................................*passim*

31 U.S.C. § 3729(a)(1)(A) ............................................................................*passim*

31 U.S.C. § 3729(a)(1)(B) ............................................................................*passim*

31 U.S.C. § 3729(a)(1)(C) ..............................................................................3, 5

31 U.S.C. § 3732(a) ..............................................................................................1

42 U.S.C. § 1320a-7b(b)(2) .................................................................................3

42 U.S.C. § 1320a-7b(g) ................................................................................3, 28

**Rules**

Fed. R. App. P. 4(a)(1)(A) ...................................................................................1

Fed. R. App. P. 4(a)(4)(A) ...................................................................................1

Fed. R. Civ. P. 9(b) ......................................................................................*passim*

Fed. R. Civ. P. 12(b)(6) ......................................................................................27

Fed. R. Civ. P. 15(a) ...........................................................................................46

Fed. R. Civ. P. 15(a)(2) ...........................................................................16, 45, 46

Fed. R. Civ. P. 59 .................................................................................................2

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Because this case is highly dependent upon the facts (both those alleged in the complaint and those concerning Relator's motion for leave to amend the complaint), Relator believes that oral argument would assist the Court.

## STATEMENT OF JURISDICTION

Plaintiff-Appellant Martin Flanagan ("Relator") invoked the district court's jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a). App. 726 (FAC ¶ 7). The district court dismissed Relator's complaint on December 2, 2022. Add. 36. On January 3, 2023, Relator moved for reconsideration, which the court denied by minute order on February 28, 2023. App. 14, 15 (ECF 43 and 55). On January 20, 2023, Relator sought leave to amend his complaint, which the court denied on March 1. App. 14, 15 (ECF 46 and 56).

Relator filed a timely notice of appeal on March 28, 2023. App. 867; *see also* Fed. R. App. P. 4(a)(1)(A) and 4(a)(4)(A).

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in dismissing the complaint for failure to satisfy Federal Rule of Civil Procedure 9(b).

2.    Whether, in the absence of any prejudice or undue delay, the district court abused its discretion in denying Relator leave to amend his complaint.

## STATEMENT OF THE CASE

Relator filed this *qui tam* action against Defendant-Appellee, Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America ("Fresenius" or "Defendant"), under seal in the United States District Court for the District of Maryland. App. 1 (ECF 1). After the United States declined to intervene

1

and the complaint was unsealed and served on Defendant, App. 4 (ECF 32, 33, 37),

Defendant moved to dismiss the complaint for failure to state a claim. App. 5 (ECF

50). In response, Relator filed a First Amended Complaint ("FAC"). App. 5 (ECF

51). Defendant then moved to dismiss the FAC, as well as to transfer the case to the

United States District Court for the District of Massachusetts. App. 6 (ECF 57, 58).

On September 30, 2021, the district court granted Defendant's motion to transfer.

App. 7 (ECF 72-73).[1]

Defendant again moved to dismiss Relator's FAC. App. 12 (ECF 27). The

district court granted Defendant's motion on December 5, 2022, holding that Relator

failed to satisfy Federal Rule of Civil Procedure 9(b). Add. 36. On January 3, 2023,

Relator moved for reconsideration pursuant to Federal Rule of Civil Procedure 59,

which the court denied. App. 14, 15 (ECF 43, 55). While Relator's motion for

reconsideration remained pending, Relator sought leave to file a Second Amended

Complaint, App. 14 (ECF 46), which the court likewise denied, Add. 39. This timely

appeal followed. App. 867.

### A.     Statutory Background

The False Claims Act ("FCA") provides that any person who knowingly

presents, or causes to be presented, a false or fraudulent claim for payment or

---

[1] The district court declined to rule on Defendant's motion to dismiss. App. 7 (ECF 73 at 1 n.1).

approval, or who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim to the government, is liable for damages. 31 U.S.C. §§ 3729(a)(1)(A), (B). The FCA also prohibits conspiring to commit a violation of any of its provisions. *Id.* § 3729(a)(1)(C).

The Anti-Kickback Statute ("AKS") prohibits "knowingly and willfully" using "any remuneration . . . directly or indirectly, overtly or covertly, in cash or in kind" to induce or reward the referral or generation of federal healthcare business. 42 U.S.C. § 1320a-7b(b)(2). "Essentially, the AKS targets any remunerative scheme through which a person is paid in return for referrals to a program under which payments may be made from federal funds." *Guilfoile v. Shields*, 913 F.3d 178, 189 (1st Cir. 2019) (citation and internal quotation marks omitted). A claim submitted to a federal healthcare program that violates the AKS is *per se* a materially false claim under the FCA. 42 U.S.C. § 1320a-7b(g); *Guilfoile*, 913 F.3d at 190-91, n.12.

## B. Factual Background

This case arises from allegations of government fraud concerning the treatment of patients with End-Stage Renal Disease ("ESRD"), who require tri-weekly dialysis treatments unless the patient obtains a kidney transplant. App. 728-30 (FAC ¶¶ 15, 18, 24). Medicare provides coverage to nearly all patients with ESRD and is the primary payor for dialysis treatments in the United States. App. 729, 733 (FAC ¶¶ 19, 21, 22, 35). Medicare coverage may be supplemented by

3

Medicaid, which often pays primary coverage for patients without Medicare coverage. App. 736 (FAC ¶ 45). Medicaid is a joint federal-state program administered by states. App. 734 (FAC ¶¶ 38-39).

Fresenius owns and operates outpatient dialysis clinics in the United States and contracts with hospitals to provide inpatient ESRD dialysis services. App. 727 (FAC ¶ 13). To obtain Medicare reimbursement, Fresenius clinics submit to Medicare a single reimbursement claim per month per patient, which includes the costs for multiple dialysis treatments. App. 731 (FAC ¶ 28). Independent dialysis facilities, including Fresenius clinics, are also required to submit annual Medicare cost reports (Form 265) that disclose cost data and include an express certification of compliance with all applicable laws. App. 731-32 (FAC ¶¶ 30-31). Among other required data on the cost reports are the hours per week worked by the clinic's medical director. App. 733 (FAC ¶ 32). During the relevant time period, each Fresenius clinic annually submitted the Form 265 with the required certification. App. 733 (FAC ¶ 34). In order to obtain the federal portion of Medicaid benefits, states quarterly submit to the federal government Form 64, reporting the state's actual expenditures, which would include the amounts the state reimbursed Fresenius for the treatment of patients resulting from the alleged kickback scheme. App. 734-35 (FAC ¶¶ 40-42). Claims tainted by illegal kickbacks are not reimbursable under federal healthcare programs, and the submission of claims for

4

referrals in violation of the AKS violate the False Claims Act. App. 725-26 (FAC ¶¶ 4-6), 735-36 (FAC ¶¶ 43-44).

Relator was employed by Fresenius for 29 years. App. 727 (FAC ¶ 11). One of his responsibilities was to negotiate contracts with hospitals for inpatient dialysis services. App. 727 (FAC ¶ 11). Relator alleges that Fresenius violated 31 U.S.C. §§ 3729(a)(1)(A) (knowingly presenting, or causing to be presented, false or fraudulent claims for payment) (Count I), 3729(a)(1)(B) (making or using, or causing to be made or used, false statements or records material to a false claim) (Count II), and 3729(a)(1)(C) (conspiracy to violate the FCA) (Count III). App. 861-63 (FAC ¶¶ 376-88). The falsity of Fresenius' certifications and its claims is premised on two fraudulent schemes:[2]

### 1. Below-Cost Hospital Contracts

The complaint alleges that, because the market for dialysis services became increasingly concentrated between two major players, Fresenius and DaVita, Fresenius' primary opportunity for growth beginning in 2007 was to capture new ESRD patients discharged from hospitals, where approximately half of all ESRD patients begin dialysis treatment. App. 749 (FAC ¶¶ 84-86). Relator alleges that, to

---

[2] Relator does not appeal the district court's dismissal of other alleged kickback schemes, including Fresenius' joint venture agreements, App. 847-61 (FAC ¶¶ 332-75), free services to hospitals and patients, App. 766-78 (FAC ¶¶ 128-161), and free practice-management services to physicians, App. 838-43 (FAC ¶¶ 308-20).

induce hospitals and their physicians to refer discharged ESRD patients to Fresenius'
outpatient clinics, Fresenius contracted with hospitals to provide inpatient dialysis
services at below cost. App. 748-66 (FAC ¶¶ 83-127).

Fresenius specifically budgeted for losses from its below-cost hospital
contracts. App. 751-52 ((FAC ¶ 90) (identifying 14 hospital contracts where losses
were expected), (FAC ¶¶ 91-93) (Fresenius' corporate management reviewed and
approved budgeted losses)). Relator was told that such contracts were "Fresenius'
standard business practice" to induce referrals of hospital patients. App. 753-54
(FAC ¶ 96). Up to 65% of Fresenius' hospital contracts ran at a loss. App. 754 (FAC
¶ 97). Fresenius' below-cost hospital contracts were extremely effective, resulting
in those hospitals' referral of 70% to 80% of discharged ESRD patients to Fresenius
clinics. App. 757-58, 761-62 (FAC ¶¶ 108, 118). Relator alleges that all claims for
services at Fresenius clinics submitted to federal healthcare programs for patients
who were referred by hospitals with which Fresenius had below-cost contracts were
false because they were tainted by this illegal referral scheme. App. 766, 780 (FAC
¶¶ 127, 166).

The FAC alleges that Fresenius' intent in offering below-cost contracts to
hospitals was to obtain referrals. "Fresenius mid-level managers (including Mr.
Flanagan and his colleagues in the Western Division) were instructed by their
superiors to obtain hospital contracts '*at any cost*' in order to secure the referrals of

discharged patients." App. 750 (FAC ¶ 88) (emphasis added). "Fresenius management, at the highest level, including the CEO and his direct reports," approved this strategy. *Id.* According to Relator and interviews with former Fresenius employees, the sole purpose of the below-cost hospital contracts was to funnel new patients to Fresenius' outpatient clinics. App. 755-57 (FAC ¶¶ 101, 102-03, 106 (quoting Witnesses 3 and 4)). Relator was told by a high-level Fresenius employee, Donna McCarthy, that "if you lose a hospital [contract] we lose referrals." App. 757 (FAC ¶ 107). Witnesses 4 and 7, former Fresenius employees, related that referrals were the reason for the below-cost contracts. Another witness testified that Fresenius' strategy was to "lose in acutes but get those referrals." App. 761 (FAC ¶ 117). Witness 9 noted that the purpose of the below-cost contracts was to "channel patients to the clinics." App. 762 (FAC ¶ 119); *see also* App. 763-65 (FAC ¶¶ 123-124).

In order to further ensure referrals from the hospitals with which Fresenius had below-cost contracts, Relator alleges that Fresenius also entered into above-fair market value ("FMV") medical director contracts with physicians at the same hospitals who were in positions to make referrals. App. 780-81 (FAC ¶ 168). Witness 11 explained that the immediate and inevitable result of this "doubling down" on hospital contracts—*i.e.* combining below-cost acute contracts with above-FMV medical director contracts—was the automatic "funneling" of patients to Fresenius

clinics. App. 773 (FAC ¶ 145). Fresenius carefully tracked the referrals resulting from the below-cost hospital contracts. App. 778-80 (FAC ¶¶ 162-66).

## 2. Medical Directors Paid Above Fair Market Value

Fresenius also induced influential nephrologists to serve as medical directors at Fresenius clinics by paying them above FMV with the understanding that, in return, medical directors would funnel patients to Fresenius' dialysis clinics. App. 780-808 (FAC ¶¶ 167-229). Fresenius focused primarily on medical directorships with nephrologists who could refer high numbers of patients. App. 783-84, 790 (FAC ¶¶ 176, 179, 195). Fresenius advertised to potential hires that its medical directors could earn significant remuneration with minimal effort, aside from referring patients. App. 783 (FAC ¶ 176).

To incentivize referrals, Fresenius paid medical directors well above the FMV rates paid by its competitors, including DaVita. App. 790, 795-96 (FAC ¶¶ 198, 201, 203) (listing Fresenius facilities, compensation for medical directors, and comparing compensation to non-Fresenius facilities); App. 795 (FAC ¶ 199). Fresenius paid its top medical directors—those who were in a position to refer the most patients—salaries that would equate to hourly rates ranging from $600 per hour to over $2,000

per hour, vastly exceeding a nephrologist's ordinary salary, which averages $147 per hour. App. 784-96 (FAC ¶¶ 181-202).[3]

As with the below-cost hospital contracts, the FAC's allegations make clear that obtaining referrals was the purpose of Fresenius' inflated, above-FMV contracts with physicians. The key to selecting physicians to serve as medical directors was the number of potential referrals to Fresenius clinics. App. 785 (FAC ¶ 183). Witness 17 stated that the only reason to have medical director contracts at all was to secure referrals, saying that Fresenius could have employed its own physicians to serve as medical directors for a fraction of the cost, but that this approach would not induce referrals. App. 786 (FAC ¶ 185). In addition, in late 2012, Fresenius undertook a nationwide Strategic Plan Review, which showed that it targeted physicians for medical directorships specifically because they could provide referrals. App. 786-88, 790 (FAC ¶¶ 185-90, 191, 195). The FAC alleges Fresenius devoted considerable efforts to track the referrals, App. 800, 803 (FAC ¶ 215, 221), and pressured physicians who did not refer the expected number of patients. App. 790, 800-03 (FAC ¶¶ 196-97, 215-22).

---

[3] Those hourly rates are computed based upon Fresenius' representations that the medical directors actually worked 8-10 hours a week, but as Relator alleges that because most medical directors worked only a few hours a month, the actual rate of pay for medical directors was even higher. App. 797-99 (FAC ¶¶ 206-12).

### 3. Allegations Relating To Specific Referrals Resulting From the Kickback Scheme And Government Payment.

Relator alleges that the below-cost acute hospital contracts resulted in referrals to Fresenius. Relator specifically alleges that Fresenius had a below-cost contract with Scripps Hospital, which resulted in "some 192 referrals per year," and that about 90% of those patients' treatments "were paid for by Federal health care programs." App. 779-80 (FAC ¶¶165-66). For those patients, about 172 per year, Fresenius provided approximately 26,832 treatments. App. 779 (FAC ¶ 165). Over a five-year period (the average length of time for dialysis treatments), "the total value of these additional referrals . . . exceeded an estimated $30 million." App. 779 (FAC ¶ 165). "Every claim for reimbursement associated with treating these patients that was submitted to Federal health care programs was . . . a false claim." *Id.*

In addition to the specific referrals from Scripps Hospital, the FAC further alleges specific referrals of Medicare and Medicaid patients to Fresenius clinics by physicians who received above-FMV compensation to serve as medical directors. Dr. Tilles, a physician practicing in southern California, was paid a total of $178,000 to serve as medical director at two Fresenius clinics, which contracts were intended to compensate him for referrals. App. 787 (FAC ¶ 188). During Fresenius' 2012 Strategic Plan Review, Fresenius employees emphasized that his contract renewal was "critical," as he was "the only physcian referring to [the Fresenius facility at]

San Jose and has the majority of patients at Fresenius' Los Gatos facility." *Id.* It is telling that the author of the Fresenius Strategic Plan also cautioned that "it is critical to retain this doctor as medical director to ensure continued referrals." *Id.* Dr. Tilles' referrals were carefully tracked, App. 813 (FAC ¶ 240), along with his contribution to Fresenius' bottom line. Dr. Tilles referred 60 patients to Fresenius' clinics in 2012 and contributed $387,211 to Fresenius' earnings. App. 813 (FAC ¶ 239). The FAC alleges that 88% to 90% of Fresenius' patients, including the patients referred to Fresenius by Dr. Tilles, were insured by federal payors. App. 779, 810, 812 (FAC ¶¶ 165, 233, 238). Similarly, Dr. Tay of Fremont Nephrology was paid $120,000 to serve as medical director at two Fresenius facilities in California, Fremont and Ardenwood, and referred a total of 127 patients to Fresenius clinics. App. 801 (FAC ¶ 216). The 2012 Strategic Plans for his area discuss the importance of providing financial incentives, including medical director compensation, to secure Dr. Tay's referrals. App. 786 (FAC ¶ 186).

Diablo Nephrology was also the recipient of highly inflated medical director payments. Fresenius' internal documents show that Fresenius had five medical director contracts with Diablo (including one for John Muir Hospital, a facility at which Fresenius had a below-cost acute contract) which were above-FMV. App. 809-10 (FAC ¶ 232). Fresenius' internal documents also show that Fresenius carefully tracked Diablo's referrals to Fresenius clinics. App. 810-11 (FAC ¶ 234).

Fresenius also tracked so-called "leakage" to competitors down to the individual patient level. App. 811 (FAC ¶ 235). Diablo had 585 patients being treated at Fresenius clinics as of August 31, 2012, only 6.9% of which were commercially insured, meaning that 93% of these patients were insured by Medicare or Medicaid. App. 810 (FAC ¶ 233). These patients received a total of 104,731 treatments, 95,000 of which were billed to federal payors. *Id.* The same is true of Balboa Nephrology, another physician practice that was handsomely paid pursuant to contracts with Fresenius. The FAC alleges that Balboa had numerous financial relationships with Fresenius that were above FMV and that Fresenius carefully tracked referrals resulting from those relationships. App. 812 (FAC ¶¶ 237, 238). Balboa had 2,175 patients that it referred to Fresenius clinics, 89.5% of which were covered by federal payors. App. 812 (FAC ¶ 238).

According to Fresenius' internal documents, Medicare and Medicaid reimbursed Fresenius $21 million for treatments at these clinics. App. 800, 803 (FAC ¶¶ 215, 221). For treatments at clinics where NANI (a physician practice in Illinois that was a major beneficiary of Fresenius' largesse) had medical directors, Medicare paid $50 million to Fresenius in 2014. App. 816-17 (FAC ¶¶ 247-48). The FAC also alleges other Medicaid payments to specific Fresenius clinics at which North Carolina medical directors were paid above FMV. App. 825-26 (FAC ¶¶ 271-

73). None of these payments would have occurred unless Fresenius submitted false claims to the government.

## C.    The District Court's Dismissal of the Complaint

The district court dismissed the FAC for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b). The district court applied this Court's decision in *United States ex rel. Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220 (1st Cir. 2004), to the claims Fresenius directly filed with Medicare, and *United States ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13 (1st Cir. 2009), to the claims that Fresenius caused state agencies to submit to the federal government for reimbursement of the federal share of Medicaid. Add. 32.

The court acknowledged that the complaint described the kickback scheme "in considerable detail" as a "multi-part scheme to compensate caregivers in return for referrals," including "identif[ying] specific hospitals, doctors, and medical practices that have allegedly benefited financially from the scheme." Add. 25. The court agreed that there was "considerable logic" to Relator's argument that, "if 100% of the business of [Fresenius] is tainted by kickbacks, and if 80%[4] or more of the

---

[4] The FAC shows that this figure is closer to 90% than to 80%. App. 779 (FAC ¶ 165).

business of [Fresenius] involves government payors, it follows that [Fresenius] must have submitted many false claims." Add. 33.

The district court nonetheless described the FAC as requiring too many "inferences": "first, the inference that the relevant financial arrangements were intended as kickbacks; second, the inference that every referral to [a Fresenius] clinic was made as a result of the kickbacks; and third, the inference that every claim for government reimbursement was tainted by the kickbacks." Add. 35. The court held the allegations as to both direct and indirect claims were deficient because the complaint failed to "identify a specific physician who made a specific referral as a result of a specific unlawful practice that resulted in a specific false claim." *Id.*; *accord* Add. 33.

The district court did not separately discuss Count II, alleging violations of section 3729(a)(1)(B), much less analyze why specific false claims must be alleged as to a count brought under a provision that does not require presentment. The court nonetheless also dismissed Count II, appearing to apply the identical pleading standard to claims brought under both section 3729(a)(1)(A) and (a)(1)(B). Add. 36. The district court likewise dismissed Count III (conspiracy) for the same reasons. *Id.*

The district court also appeared to adopt a "but for" causation standard, suggesting that Relator must "plausibly" allege "specific payments concerning specific patients [that] were caused by the AKS violation . . . ." Add. 34.

14

### D. The District Court's Denial of Leave to Amend

The district court cursorily denied Relator's motion for leave to amend his complaint to allege the exemplar claims the district court had found lacking. The court explained that, "[i]t should have been obvious from the beginning that relator would be required to *prove* that false claims were submitted to the government, and that those claims would have to be *proved* with particularity." Add. 38 (emphases added).

Although the court noted that, "normally," seeking to amend a complaint "is a permissible response" to a motion to dismiss, the court chastised Relator for "waiting for the court to rule, and then seeking to cure the deficiencies . . . pointed out in the court's opinion." *Id.* The court stated that it "spent considerable time and resources reviewing the record, considering the brief of the parties and the legal authorities cited, and preparing a memorandum and order that ultimately ran to 36 pages." Add. 39. The Court further criticized the Relator, stating: "If the Court's judgment is incorrect, it can of course be overturned by the Court of Appeals. But surely the purpose of that exercise was not simply to prod relator's counsel into seeking out additional evidence to try to bolster his claims." *Id.* In any event, the court concluded, without further explanation, that "the extensive delays, and obvious prejudice to defendant, are sufficient reason to deny the motion to amend under Fed. R. Civ. P. 15(a)(2)." *Id.*

## SUMMARY OF THE ARGUMENT

With respect to Relator's claims brought under section 3729(a)(1)(A), the district court erred by requiring Relator to provide specific exemplar false claims in order to survive a Rule 9(b) challenge. This Court has never held that allegations of specific false claims are required in every FCA case, much less in a case in which the Relator alleges that false claims resulted from a widespread and systematic scheme to pay kickbacks to physicians who had considerable market power—*i.e.,* were able to refer significant numbers of patients to Fresenius—coupled with specific examples of referrals from those physicians to Fresenius clinics.

The district court misapplied *Karvelas* by requiring an exemplar false claim, as opposed to "some" details of "some" false claims, and ignored the holding in *Escobar* that the pleading standard can be relaxed in cases of "systematic failures" to follow Medicare regulations, so long as there are sufficient details regarding claims as to even a single patient. Moreover, the district court refused to draw reasonable inferences in Relator's favor, as it was required to do. These same errors also infected the district court's analysis of Medicaid claims under *Duxbury*.

The district court likewise, in *dicta*, adopted a "but for" causation standard that is inconsistent with the law in this Circuit. That erroneous causation standard, therefore, is not an alternate grounds for this Court to affirm the opinion below. This

Court, therefore, should reverse the order of dismissal and remand for further proceedings.

With respect to Relator's claims brought under section 3729(a)(1)(B), the district court plainly erred in requiring that Relator allege that a specific claim resulted from a specific physician as a result of a kickback, as (a)(1)(B) does not require presentment of a false claim. Nor is there case law in this Circuit that requires an (a)(1)(B) claim to allege a specific exemplar claim at the pleadings stage.

At a minimum, this Court should reverse the district court's denial of leave to amend the complaint. The district court abused its discretion in denying leave to amend where Relator had not previously sought leave to amend, the district court's dismissal order was the first time Relator's claims were subject to a Rule 9(b) analysis, there is no record evidence that amendment would prejudice Defendant, and Relator promptly moved for leave to amend after he obtained the claims data that he sought to add to his complaint.

## STANDARD OF REVIEW

This Court reviews *de novo* the dismissal of a complaint for failure to satisfy Federal Rule of Civil Procedure 9(b). *E.g.*, *U.S. ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 123 (1st Cir. 2013). This Court reviews for abuse of discretion the denial of leave to amend a complaint. *E.g.*, *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 36 (1st Cir. 2022). An abuse of discretion occurs when a

district court "relies upon an improper factor, omits consideration of a factor entitled to substantial weight or mulls the correct mix of factors but makes a clear error of judgement in assaying them" or "adopts an incorrect legal rule." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 295 (1st Cir. 2000).

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN DISMISSING RELATOR'S COMPLAINT.

### A. The Complaint Satisfies Rule 9(b) For Claims Brought Under Section 3729(a)(1)(A)

For purposes of claims brought under 31 U.S.C. § 3729(a)(1)(A), a complaint satisfies Rule 9(b) under this Court's precedents if the complaint "provide[s] details that identify particular false claims for payment that were submitted to the government." *Karvelas,* 360 F.3d at 232. Such details include:

> the dates . . ., the content . . ., [and the] identification numbers [of the claims], the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims . . . .

*Karvelas,* 360 F.3d at 233. "[D]etails concerning" these "types of information . . . may help a relator to state his or her claims with particularity." *Id.*

*Karvelas* does not impose "a checklist of mandatory requirements," *id.*, but instead explains that only "*some* of this information for at least *some* of the claims must be pleaded in order to satisfy Rule 9(b)." *Id.* (emphasis added) (quoting *U.S.*

*ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1312 n.21 (11th Cir. 2002)). "*Karvelas* recognized that Rule 9(b) may be satisfied where, although some questions remain unanswered, the complaint as a whole is sufficiently particular to pass muster under the FCA." *U.S. ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 732 (1st Cir. 2007); *see also U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 46 (1st Cir. 2009) ("*Karvelas* . . . allows some flexibility in construing the fraud allegations of FCA complaints."). A plaintiff is *not* required to submit "evidence of an actual false claim" at the pleadings stage. *U.S. ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 58 (1st Cir. 2017).

This Court has made clear that the Rule 9(b) analysis is case- and fact-specific, "declin[ing] to draft a litigation manual full of scenarios of what allegations would be sufficient for purposes of Rule 9(b)." *Duxbury*, 579 F.3d at 32 (citation and internal quotation marks omitted); *accord U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009) ("no single construction of Rule 9(b) . . . applies in all contexts"). This Court has never held that to survive a Rule 9(b) challenge every complaint must allege specific false claims. *See Duxbury*, 579 F.3d at 29-30; *Grubbs*, 565 F.3d at 187 (*Karvelas* "did not . . . reach the question of whether all complaints alleging a False Claims Act presentment claim must include details of specific bills"). But the district court miscontrued the teachings of *Karvelas* and *Duxbury*, deciding instead that the only way to satisfy Rule 9(b) was to include

specific exemplar claims. Not only did the district court incorrectly require specific claims, but the court required Relator to identify a specific claim from a specific physician resulting from a kickback in order to survive 9(b) scrutiny. That is not the law in this Circuit.

Furthermore, this Court has held that there are at least some circumstances in which the relaxed pleading standards applied to indirect claims in *Duxbury*, 579 F.3d at 31, may be applied to complaints alleging the direct submission of claims. *See U.S. ex rel. Escobar v. Universal Health Servs., Inc.*, 780 F.3d 504, 515 (1st Cir. 2015), *overruled on other grounds by* 579 U.S. 176 (2016). In *Escobar,* this Court held that allegations concerning just a single patient were sufficient to support an inference of a widespread scheme to defraud because those individual claims arose from a "systematic failure" that necessarily "infected" other claims. *Id.*

The question here is whether details about the specific referrals resulting from Fresenius' kickback scheme, coupled with the fact that nearly 90% of its ESRD patients are covered by federal healthcare programs and the resulting payments from federal healthcare programs, make it "statistically certain" that false claims were submitted (or caused to be submitted). In these circumstances, Fresenius' kickbacks-for-referrals scheme would have made no economic sense unless Fresenius sought reimbursement for treatment of patients referred to it, including the 90% of patients that are covered by Medicare and Medicaid. *Cf. U.S. ex rel. Nargol v. DePuy*

*Orthopaedics, Inc.*, 865 F.3d 29, 40-41 (1st Cir. 2017) (schemes in *Duxbury* and *Nargol* created strong inference that false claims were submitted); *U.S. ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 85 (2d Cir. 2017) (the facts alleged in the complaint "support[] a strong inference that false claims were submitted *to the government*"); *Grubbs*, 565 F.3d at 192 ("That fraudulent bills were presented to the Government is the logical conclusion of the particular allegations in [relator's] complaint . . . ."); *U.S. ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267, 278-79 (D. Mass. 2010) ("[T]he very essence of the overfill kickback scheme is that providers would be able to profit by claiming Medicare reimbursement for the free overfill . . . .").[5]

In this case, with respect to the physician medical director kickback allegations, the allegations relating to referrals from a solo physician and two physicians groups provide the level of detail required by *Karvelas* and *Escobar*. The FAC alleges that Dr. Tilles had two medical director positions with Fresenius, which paid him $178,000 total, primarily to generate referrals. His contract renewal was "critical," as he was "the only physican referring to [the Fresenius facility at] San Jose and has [the] majority of [patients at Fresenius' facility at] Los Gatos." App.

---

[5] If this Court agrees, reversal should be as to the entire complaint, including Count III (conspiracy). Because Count III depends on the substantive allegations of fraud supporting Counts I and II, Count III should survive dismissal if either Count I or Count II survives.

787 (FAC ¶ 188) ("it is critical to retain this doctor as medical director to ensure continued referrals"). That the purpose of payment was to induce referrals is further supported by allegations that Dr. Tilles' referrals were carefully tracked, along with his contribution to Fresenius' bottom line. App. 813 (FAC ¶ 240) (Dr. Tilles referred 60 patients to Fresenius' clinics in 2012 and contributed $387,211 to Fresenius' earnings). The FAC alleges that 88% to 90% of Fresenius' patients, including those referred by Dr. Tilles, were insured by federal payors. App. 779 (FAC ¶ 165). These facts create a plausible inference that at least one of the patients referred by Dr. Tilles to Fresenius, as of November 28, 2012, was a Medicare or Medicaid recipient for whom false claims were submitted. App. 813 (FAC ¶ 240-41). Similarly, Dr. Tay was paid $120,000 to serve as medical director at two Fresenius facilities in California (Fremont and Ardenwood) and referred a total of 30 patients to Fresenius 2012 and 32 in 2013, and his practice group, Fremont Nephrology, referred to Fresenius 86 patients in 2012 and 95 in 2013. App. 801 (FAC ¶ 216). Fresenius' internal documents expressly refer to the use of financial incentives to secure his referrals. App. 786 (FAC ¶ 186).

The FAC also alleges that Diablo Nephrology Medical Group in California received kickbacks through a number of medical director positions that resulted in patient referrals to Fresenius clinics. App. 809-10 (FAC ¶¶ 232-33). Fresenius tracked that group's referrals, including individual patients who may have been

referred to competitors (what Fresenius called "leakage"). App. 810-11 (FAC ¶¶ 234-35). In 2012, Diablo Nephrology referred at least 585 patients to Fresenius, 93% of whom were covered by federal healthcare programs. App. 810 (FAC ¶ 233). Fresenius provided 104,731 treatments to those patients, over 95,000 of which were billed to federal healthcare programs at a cost of $230 per treatment, amounting to more than $21 million in Medicare and Medicaid reimbursements per year. *Id.* Fresenius allegedly had similar medical director arrangements with Balboa Nephrology Medical Group in Southern California to induce referrals. App. 812 (FAC ¶¶ 236-38). Fresenius likewise carefully tracked referrals from this group. App. 812 (FAC ¶ 238). In 2013, Balboa Nephrology referred 2,175 patients to Fresenius, almost 90% of whom were covered by federal healthcare programs. *Id.* Fresenius' claims for reimbursement for the patients referred by these physician groups were all false because they were tainted by the illegal kickbacks. *Id.*; *see also* App. 826-27 (FAC ¶¶ 273-74).

With respect to the below-cost contracts with hospitals, the allegations regarding Scripps Hospital provide the level of detail required by this Court. The FAC specifically alleges that Fresenius entered into a below-cost contract with Scripps Hospital to induce referrals, that contract actually resulted in "some 192 referrals per year," and that about 90% of those patients' treatments was "paid for by Federal health care programs." App. 779-80 (FAC ¶¶ 165-66). For those patients,

about 172 per year, Fresenius provided approximately 26,832 treatments. App. 779-80 (FAC ¶ 165). Over a five-year period (the average length of time for dialysis treatments), "the total value of these additional referrals . . . exceeded an estimated $30 million." *Id.* "Every claim for reimbursement associated with treating these patients that was submitted to Federal health care programs was . . . a false claim." *Id.* Where 88% to 93% of Fresenius' patients are covered by federal healthcare programs, the statistical probability is *zero* that *none* of the patients referred by Drs. Tay and Tilles, or by Balboa and Diablo or by Scripps Hospital (a cumulative total of 3,139 patients), was covered by federal health benefit programs. Nevertheless, that was the inference the district court drew, instead of the more plausible one— *i.e.*, that a significant number of the patients among the 3,139 referred in the manner detailed by Relator's specific allegations were covered by federal payors.

The complaint in this case thus meets the specificity requirements imposed by both *Karvelas* and *Escobar* with respect to, at a minimum, the patients referred by Drs. Tay and Tilles, as well by Diablo Nephrology, Balboa Nephrology, and Scripps Hospital. First, the FAC alleges that above-FMV payments were made to these physicians and practice groups and that the purpose of the payments was to secure referrals. The same is true of the Scripps Hospital contract. The FAC alleges that these above-FMV medical director payments and the below-cost hospital contracts resulted in referrals. App. 779-80, 801, 810, 812, 813 (FAC ¶¶ 165, 216, 233, 238,

240). Illustrating this, with respect to the Diablo and Balboa practice groups, the FAC alleges the precise percentage of patients whose care was reimbursed by federal payors, the amount of Medicare and Medicaid reimbursement paid, and the amount the practice contributed to Fresenius' bottom line. App. 810, 812 (FAC ¶¶ 233, 238). The FAC also alleges that these referrals were made and reimbursement sought in late 2012. App. 801, 810, 812, 813 (FAC ¶¶ 216, 233, 238, 240). That is more than sufficient under this Court's case law to survive a Rule 9(b) challenge as to the Relator's allegations that Fresenius paid kickbacks to physicians to induce referrals.

That conclusion flows from the language in *Escobar*. In that case, the Court held that, even though the complaint provided specific information about claims made with respect to one patient, "it also seeks damages for bills submitted for services rendered to all MassHealth recipients" by the same unqualified healthcare providers within a six-year period. *Escobar*, 780 F.3d at 515. The Court concluded that, "where Relators have raised a particular and plausible allegation of fraud in connection with the treatment of their daughter, we do not view the absence of more precise details pertaining to the bills for services provided to other MassHealth recipients as an impediment to proceeding." *Id.* This Court was persuaded that the allegations in *Escobar* were the result of a "systematic failure to enforce supervision requirements" and that therefore "it stands to reason that billing for more than one MassHealth recipient has been infected by fraud." *Id.* Here, the FAC alleges

Fresenius' "systematic failure" to comply with the AKS, in which hospitals, practice groups, and physicians who had these illegal financial relationships were induced to refer patients to Fresenius for dialysis services. *See supra* pp. 5-10.

The district court nevertheless faulted the allegations in the complaint as insufficient because "[e]ach step in that argument relies on an inference." The court enumerated each step where the FAC required an inference: "first, the inference that the relevant financial arrangements were intended as kickbacks; second, the inference that every referral to [a Fresenius] clinic was made as a result of the kickbacks; and third, the inference that every claim for government reimbursement was tainted by the kickbacks." Add. 35. However, at the pleadings stage, the court was required to take "the complaint's well-pleaded facts as true, and . . . draw all reasonable inferences in [the plaintiff's] favor." *Frese v. Formella*, 53 F.4th 1, 5 (1st Cir. 2022) (quoting *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018)); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (in evaluating Rule 12(b)(6) motion, the court must "take the complaint's well-pled (*i.e.,* non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor"). At this stage, the *only* inference that can be drawn from Relator's allegations, which directly quote Fresenius' own documents, is that these arrangements, particularly with respect to Drs. Tay and Tilles and to Balboa and Diablo, were intended as kickbacks to induce referrals. When a complaint quotes

26

a defendant's own words that a physician's medical director is "critical" to referrals, it is not speculative to infer that the scheme was intended as a kickback to reward referrals. When a defendant's internal documents carefully track referrals from a particular physician group and calculate a return on investment and "leakage" to competitors, the only reasonable inference is that the payments were kickbacks intended to induce referrals. Indeed, there is no business reason for Fresenius to track referrals from particular physicians or groups unless it wanted to validate its return on investment for the compensation it paid to those groups.

With respect to the third of Judge Saylor's faulted "inferences," the statutory language of the AKS, which renders every claim tainted by kickbacks a "false claim," is plainly not a factual inference as to which Relator was obligated to supply plausible allegations, but a legal one that claims tainted by kickbacks were false claims. *See Guilfoile*, 913 F.3d at 190 ("it is enough to say that in light of § 1320a-7b(g), '[a]n AKS violation that results in a federal health care payment is a per se false claim under the FCA'" (quoting *U.S. ex rel. Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017))); *U.S. ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 97 (3d Cir. 2018) ("[t]he Government does not get what it bargained for when a defendant is paid ... for services tainted by a kickback" (alteration in original) (quoting *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295 (3d Cir. 2011))).

27

Thus, the allegations that Fresenius expected referrals in exchange for kickbacks are neither speculative, nor conjecture. They are derived from Fresenius' own internal documents, bolstered by multiple interviews with ex-Fresenius employees and with employees of physician practices, all of which confirm the referral patterns resulting from the kickbacks that Relator alleged and also corroborate that this was Fresenius' purpose in contracting with these hospitals and physician groups. The complaint plausibly alleges that Fresenius submitted claims for federally insured patients. *See supra* pp. 10-13. Relator also identifies specific medical directors by clinic who were paid above fair market value in order to "buy" their referrals. *See supra* pp. 10-13. Fresenius submitted reimbursement claims for these referred patients, all of which were false because they were tainted by kickbacks. *See supra* pp. 10-13; *e.g.*, App. 817, 821, 827, 829, 830-31, 833 (FAC ¶¶ 249, 257, 274, 284, 286, 293).

Although the complaint does not include exemplar claims, the complaint adequately pleads for purposes of the law in this circuit both that Fresenius submitted reimbursement claims to the government for patients that were referred to Fresenius because of kickbacks and that those claims were all *per se* false because they were in violation of the AKS. *See, e.g.*, *Guilfoile*, 913 F.3d at 190 (violation of the AKS "that results in a federal health care payment is a per se false claim under the FCA" (quoting *Lutz*, 853 F.3d at 135)). To receive Medicare or Medicaid payments, a

healthcare provider must submit a claim. *See, e.g.*, App. 731 (FAC ¶ 29) (Fresenius clinics use Form UB-04 to submit Medicare claims); App. 734-35 (FAC ¶¶ 40-41) (state Medicaid administrators quarterly file Form 64 with CMS).

These detailed allegations are in sharp contrast to those that *Karvelas* found insufficient to satisfy Rule 9(b). In *Karvelas*, although the plaintiff "describe[d] the procedures allegedly used by the hospital to submit false claims," the Court concluded that the "existence of such procedures does not permit us to speculate that false claims were in fact submitted." 360 F.3d at 235. Here, Relator identified not just billing procedures, but, in many cases, the actual number of patients referred and treatments provided, the time periods and dollar amounts at issue, and amounts paid by Medicaid to certain clinics. The allegations as to false claims here, therefore, are neither generalized, nor conclusory. Nor do they require the Court to speculate that false claims were submitted.[6]

---

[6] The district court's reliance on *U.S. ex. rel. Kelly v. Novartis Pharms. Corp.,* 827 F.3d 5 (1st Cir. 2016), to preclude an inference that false claims were submitted, is particularly troubling as *Kelly* held that, in the context of off-label marketing, "[m]erely alleging that a scheme was wide-ranging—and, therefore, that a fraudulent claim was presumably submitted—will not suffice," because a court may not reasonably infer that false claims result from unlawful off-label promotion, given that patients taking a drug for off-label use may pay out-of-pocket (and *not* seek reimbursement). *Id.* at 13-14. This Court has repeatedly distinguished off-label

Outside of the context of off-label marketing, *see supra* note 6, reasonable inferences are wholly appropriate in determining whether a plaintiff has satisfied Rule 9(b). *See, e.g.*, *Karvelas*, 360 F.3d at 235 (precluding speculation, but not the drawing of reasonable inferences); *Gagne*, 565 F.3d at 47 ("*Karvelas* . . . allows some flexibility in construing the fraud allegations of FCA complaints."); *Nargol*, 865 F.3d at 37-41 (inferences are permissible at the pleading stage, especially where relators lack access to documentation but have knowledge of fraud); *Duxbury*, 579 F.3d at 29 (relator can "satisfy Rule 9(b) by providing 'factual or statistical evidence to strengthen the inference of fraud beyond possibility'" (quoting *Rost*, 507 F.3d at 733)); *U.S. ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 372 (5th Cir. 2017) (allegations in complaint created a "strong inference that the named hospitals submitted claims to Medicare"). Indeed, courts are required to draw all reasonable inferences in plaintiff's favor in determining whether a complaint should be dismissed for failure to satisfy Rule 9(b). *Lawton*, 842 F.3d at 130; *see also Duxbury*, 579 F.3d at 20.

---

marketing cases because the nature of the fraudulent activity does not, by itself, support a plausible inference that false claims were filed. *See Booker*, 847 F.3d at 58; *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 11 (1st Cir. 2016); *Lawton ex rel. U.S. v. Takeda Pharm. Co.* 842 F.3d 125, 132 (1st Cir. 2016); *Kelly*, 827 F.3d at 15; *Nargol*, 865 F.3d at 39-40 (distinguishing off-label marketing cases because of "the nature of the conspiracy"). Here, there is no question that false claims were filed by Fresenius.

**B. The Complaint Satisfies Rule 9(b) As It Applies To Claims Brought Under Section 3729(a)(1)(B)**

Although Rule 9(b) does apply both to claims brought under either section 3729(a)(1)(A) or (a)(1)(B), *Ge*, 737 F.3d at 125 n.5; *Gagne*, 565 F.3d at 45-46, the elements of the two claims differ. Under (a)(1)(B) (formerly (a)(2)), presentment of a specific false claim is not required. Instead, the relator must "connect the allegedly fraudulent statement to a *planned* claim on the government fisc," but need not show that such a claim was actually submitted or presented to the government, as is required for claims under (a)(1)(A). *Gagne*, 565 F.3d at 46 n.7 (emphasis added) (*Karvelas*' holding that "a complaint must 'provide details that identify particular false claims for payment that were submitted to the government'" applies only to "cases under subsection (a)(1)" (quoting *Karvelas*, 360 F.3d at 232)); *id.* ("*Allison Engine* . . . forecloses, in subsection (a)(2) and (a)(3) cases, a broad reading of portions of our *Karvelas* and *Rost* holdings."); *Westmoreland*, 738738 F. Supp. 2d at 272. Because a relator ultimately need not prove that a false claim was submitted under section (a)(1)(B), at the pleading stage a relator need not allege that a specific false claim was submitted. *See, e.g.*, *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009) (plaintiff need not allege what he need not prove).

The district court did not distinguish between Relator's two claims, but instead required Relator to allege at least one specific false claim that was, in fact,

submitted to the government for both categories of claims. Add. 33; *accord* Add. 3, 30, 35. The district court held Relator to the incorrect legal standard with respect to section 3729(a)(1)(B), a clear error of law which must be corrected. A requirement that a relator allege a "connection" to a planned claim on the government fisc falls far short of the requirement imposed by the district court that Relator "identify a specific physician who made a specific referral as a result of a specific unlawful practice that resulted in a specific false claim." Add. 35.

The clear majority view of courts in this Circuit considering this issue since the FERA amendments has held that a complaint predicated on (a)(1)(B) does not have to allege the presentation of specific false claims to the Government. *See, e.g.*, *U.S. ex rel. Herman v. Coloplast Corp.*, No. CV 11-12131-RWZ, 2016 WL 4483869, at *3 (D. Mass. Aug. 24, 2016) ("As a matter of law, Rule 9(b) does not require relators to point to any particular claim for payment to adequately plead a violation of section (a)(1)(B)—it merely requires them to identify a particular false statement made by the defendant."); *U.S. ex rel. Craschini v. Ahold USA Inc.*, 282 F.R.D. 27, 35-36 (D. Mass. 2012) (relator need not allege that defendant submitted false claims); *see also U.S. ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 123 (D.D.C. 2014) (Jackson, J.) (the elements of a claim under section 3729(a)(1)(B) properly do not include a requirement of presentment as that language is absent from the statute itself). In *Tran*, Judge Jackson held that there was not even a requirement

under section 3729(a)(1)(B) that the false records and statements created in connection with a planned claim be presented to the Government. *Id.* Similarly, in *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017), the Eleventh Circuit held that the elements of section (a)(1)(B) do not include a presentment or payment requirement. *See also U.S. ex rel. Patel v. GE Healthcare, Inc.*, No. 8:14-cv-120-T-33TGW, 2017 WL 4310263, at *8 (M.D. Fla. Sep. 28, 2017) ("[A] relator is not required to allege presentment because the statutory language includes no express presentment requirement.").

In *United States ex rel. Mastej v. Health Management Associates Inc.*, the court held that "Congress specifically amended the liability standards set forth in § 3729(a)(2), now codified at § 3729(a)(1)(B), in order to *remove the presentment requirement imposed by the Supreme Court's decision* [in *Allison Engine*]." No. 2:11-cv-89-FtM-29 DNF, 2013 WL 1149255, at *10 (M.D. Fla. March 19, 2013) (emphasis added), *rev'd on other grounds*, 591 F. App'x 693, 710 (11th Cir. 2014). That amendment "creates the possibility of FCA liability even where a false statement or record is not made for the purpose of getting a false or fraudulent claim paid or approved by the Government." *U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*, No. 05-279 WJ/WDS, 2010 WL 11431465, at *4 (D.N.M. July 7, 2010) (internal quotation marks omitted). An (a)(1)(B) claim requires only that the plaintiff allege that the defendant made a false record or statement material to a planned false or

fraudulent claim. Yet, contrary to First Circuit law, the district court required Relator to put forward details of a specific false claim that was submitted to the government. To engraft a presentment requirement onto an (a)(1)(B) claim in light of the statutory language and the First Circuit's decision in *Gagne* is plainly wrong.

In *Tran*, Judge Jackson held that "Relator's Material False Statement count survives CSC's motion to dismiss because the complaint alleges . . . that CSC made material false statements to the government in the form of its submission of semi-annual reports" in which CSC falsely certified "its compliance with the small business subcontracting requirements." *Tran*, 53 F. Supp. 3d at 123. The Court noted that, "the complaint identifies the specific statements at issue, the reasons that they were allegedly false, and CSC's knowledge of their falsity." *Id.* at 124. This case presents a similar set of circumstances. First, the complaint alleges that Fresenius annually certified its compliance with the AKS in the cost reports it submitted to CMS. App. 731-33 (FAC ¶¶ 30-32). Fresenius also certified in these cost reports the number of hours its medical directors worked. Although not required to survive a motion to dismiss under 9(b), the Relator alleges that these "materially false statements" were actually submitted to the government. App. 733, 797 (FAC ¶¶ 32, 206).

Using Judge Jackson's rubric, the statements that Fresenius was in compliance with the AKS were allegedly false because Fresenius is plausibly alleged to have

paid kickbacks to hospitals and physicians with the intent to induce referrals. The complaint alleges that Fresenius entered into contracts with hospitals that were below cost and with physicians that exceeded FMV compensation. App. 748-66, 780-808 (FAC ¶¶ 83-127, 167-229). These non-FMV payments were designed to obtain referrals. App. 750, 755-56, 757, 761, 762 (FAC ¶¶ 88, 101-103, 106-107, 117, 119) (hospital contracts); App. 773, 780, 785, 786-88, 790 (FAC ¶¶ 145, 168, 183, 185-191, 195) (physician contracts). Fresenius allegedly devoted considerable efforts to track the referrals, App. 800, 803 (FAC ¶¶ 215, 221), and pressured physicians who did not refer patients as expected, App. 790, 800-04 (FAC ¶¶ 196-197, 215-222).

Moreover, the Complaint makes clear that Fresenius' fraudulent scheme depended upon Fresenius seeking reimbursement for the cost of treating its new patients, especially given that the costs it incurred by paying kickbacks to obtain those referrals amounted to tens, if not hundreds, of millions of dollars. App. 790-95, 796, 797, 814, 815-16, 820, 824-25, 826-27, 831, 832-33 (FAC ¶¶ 198, 203, 205, 242, 246, 256, 270, 273, 288, 292). A reasonable inference from these allegations is that Fresenius fully intended to bill all payors, including federal health care programs, for treatments resulting from each referral. To do otherwise would defeat the entire purpose of the scheme, which was to grow Fresenius' business. The false statements about Fresenius' compliance with the AKS were therefore "connected"

to planned claims on the government fisc, and those statements were material to those claims. *See, e.g.*, *Guilfoile*, 913 F.3d at 190 (violation of the AKS "that results in a federal health care payment is a per se false claim under the FCA" (quoting *Lutz*, 853 F.3d at 135)).

This Court could also conclude that Fresenius made other "false records and statements" that were not submitted to the government, but that were nonetheless material to false claims. These include Fresenius' statements in state certificate of need proceedings that relied upon illegal referrals generated by its kickback scheme to argue that it needed new facilities (or to expand existing facilities) in order to respond to growth in the market. *E.g.*, App. 818-20 (FAC ¶¶ 250-54). Fresenius also entered into draconian non-compete agreements with physicians, falsely representing that they were needed to protect Fresenius' legitimate business interests, when in fact those agreements were designed to "lock-in" referrals to Fresenius clinics by making it impossible for physicians to refer patients to Fresenius' competitors. App. 804-08 (FAC ¶¶ 223-29). According to Witness 19, medical directors were not only required to send their patients to a Fresenius facility, "that was expected. That's the whole reason for the [non-compete] agreements. . . . The way you get the [referral] funnel is by tying the doctors to these onerous agreements they can't get out of." App. 806 (FAC ¶¶ 224-25). These statements were material to planned claims on the government fisc, and were a part of Fresenius

scheme to secure referrals and to increase the number of treatments which would be billed to federal payors.

As noted above, and as the district court recognized, the complaint "describes—in considerable detail—a multi-part scheme to compensate caregivers in return for referrals." Add. 25. That scheme would have made no sense, and those referrals would have had little to no value to Fresenius, unless it sought federal reimbursement for all of the referred patients that it treated. *Cf. Nargol*, 865 F.3d at 40 (observing that, in *Duxbury*, "the entire purpose of giving doctors free product was so that they would seek reimbursement to realize the kickback" and "[t]he alleged scheme would have made little sense had reimbursement not been sought"); *id.* at 41 ("latency of the defect [in the medical device] was such that doctors would have had no reason not to submit claims for reimbursement for noncompliant devices"); *Chorches*, 865 F.3d at 85 ("Indeed, it is difficult to conceive of a reason why [defendant] would go through the trouble of qualifying [ambulance] runs as medically necessary if not to claim reimbursement for them."); *Grubbs*, 565 F.3d at 192 (alleged scheme in which doctors created records of unprovided services "amounts to more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government"). Fresenius itself admits that

government payors pay for up to 90% of its patients. To forego billing for that number of patients would make Fresenius' kickback scheme unprofitable.

Further, Relator alleges that Fresenius' certifications on its annual cost reports to Medicare that its medical directors worked 8 to 10 hours per week on average were false, and were material to a planned claim because those representations were designed to disguise the extent to which the payments to medical directors were not at FMV. The FAC plausibly alleges that these certifications were false, because Fresenius did not track hours, and could not know how many hours medical directors spent on their duties, App. 798 (FAC ¶¶ 208-09); many medical directors never came to the clinics at all, App. 798-800 (FAC ¶¶ 209, 211-12); and the number of hours certified could not have been true because, in many cases, it would have meant that physicians worked hours that were physically impossible. One Houston nephrologist, Dr. Charles Crumb, for example, served as medical director for twenty-nine of Fresenius' hospital contracts. App. 798-99 (FAC ¶ 210). Had Dr. Crumb performed 8 hours per week at each of those hospitals, consistent with Fresenius' certifications, that would have amounted to an impossible 232-hour work week. Another physicians' group, Internal Medical Nephrologists in Indiana, which held medical directorships at five Fresenius facilities, would have worked an impossible 23,000 hours to fulfill the requirements of the cost reports. App. 732, 822 (FAC ¶¶ 31, 263) (alleging specific certification language on cost reports).

The complaint alleges with particularity how Fresenius' fraudulent scheme, and the false and fraudulent records and statements it made, connect with its planned request for payment from the government in violation of section 3729(a)(1)(B). Therefore, this Court should reverse the dismissal of Count II. If this Court reverses as to Count II, it should also reverse as to Count III (conspiracy), which was dismissed for the same reason as Count II. Add. 36. Conspiracy claims, like claims under (a)(1)(B), do not require allegations of specific false claims. *See, e.g.*, *Gagne*, 565 F.3d at 45-46.

### C. The District Court Erred In Its Application Of *Duxbury* To Indirect Medicaid Claims

As noted, where a defendant allegedly induces third parties to file false claims, this Court has applied an even "more flexible" approach. *See, e.g.*, *Kelly*, 827 F.3d at 13; *Duxbury*, 579 F.3d at 29-30; *Rost*, 507 F.3d at 732. This more flexible approach permits a relator to "provid[e] 'factual or statistical evidence to strengthen the inference of fraud beyond possibility without necessarily providing details as to each false claim' submitted." *Kelly*, 827 F.3d at 13 (quoting *Duxbury*, 579 F.3d at 29-30). "Such evidence must pair the details of the scheme with 'reliable indicia that lead to a strong inference that claims were actually submitted.'" *Nargol*, 865 F.3d at 39 (quoting *Ge*, 737 F.3d at 123–24).

Even though it acknowledged that Medicaid claims are submitted to the states, which then obtained reimbursement from CMS, Add. 26, the district court faulted Relator for relying on reasonable inferences to fufill the requirement to allege that Medicaid claims resulted from the alleged scheme, Add. 35. The district court thus ignored the very purpose of the "more flexible" approach, which permits a relator to provide facts that "strengthen the inference" that false claims were submitted. *Duxbury*, 579 F.3d at 29; *see also Chorches*, 865 F.3d at 84-85, 91-92 (applying a *Duxbury*-like standard and concluding that, "[i]f the allegations as to the falsification scheme are true, as we must assume at the pleading stage, it is highly implausible to suggest that the resulting records were never submitted to the federal government for reimbursement").

The district court viewed Relator's allegations as similar to those in *Ge,* Add. 25, but unlike *Ge*, Relator does not seek an inference that false claims were submitted solely because fraudulent conduct occurred. Rather, Relator specifically alleges that Medicaid claims were caused to be submitted by the states to (and paid by) the government, providing detailed figures regarding the 3,813 Medicaid patients referred, the number of treatments resulting in 45,756 claims, and from 2014 to 2019 the yearly amounts in Medicaid payments for each Fresenius facility, which were caused to be submitted to the government for reimbursement. *See* App. 826-27 (FAC ¶¶ 272-74) (allegations regarding North Carolina Fresenius facilities).

Moreover, Relator explained why all of those claims were false and why Fresenius'

scheme must necessarily have resulted in the submission of false claims to the

government—*i.e.*, because the scheme would have made no economic sense unless

false claims were submitted. *See, e.g.*, *Nargol*, 865 F.3d at 40-41 (discussing scheme

in *Duxbury*, which "would have made little sense had reimbursement not been

sought"); *U.S. ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 457-58,

461 (4th Cir. 2013) (distinguishing cases which allege "an integrated scheme in

which presentment of a claim for payment was a necessary result" of the scheme);

*Grubbs*, 565 F.3d at 192. The district court, therefore, plainly erred in its application

of *Duxbury* to the Medicaid claims.

### D.     The District Court Erred In Its Application Of A "But For" Causation Standard To Relator's Complaint

The district court's error in adopting a "but for" causal standard cannot serve

as an independent, alternative ground upon which to affirm the judgment because

such a standard is inconsistent with the law in this circuit.[7] This Court has previously

stated that, if there is a sufficient causal connection between an AKS violation and

a claim submitted to the federal government, the claim is false within the meaning

---

[7] The district court's "but for" requirement, Add. 35, was *dicta*, as it was not necessary to the court's judgment. Add. 36 (stating that, "[i]n any event," regardless of Relator's failure to allege 'but for" causation, Relator was required to allege a specific false claim). Because that ruling was *dicta*, the Court need not reach that issue to reverse the judgment.

of the FCA. *Guilfoile*, 913 F.3d at 190 (*citing with approval Greenfield*, 880 F.3d at 96-98).

The exacting causal connection discussed by the district court approaches a "but-for" causation requirement, which has not been adopted by this circuit. As the *Greenfield* court extensively explained, "the legislative history of the 2010 amendments to the AKS indicates that Congress sought to make it easier, not harder, to bring (and ultimately prove) FCA claims predicated on violations of the AKS." *U.S. ex rel. Fitzer v. Allergan, Inc.*, No. 1:17-CV-00668-SAG, 2022 WL 3599139, *10 (D. Md. Aug. 23, 2022) (citing *Greenfield*, 880 F.3d at 96-97), *motion to certify appeal denied*, No. 1:17-CV-00668-SAG, 2022 WL 9974736 (D. Md. Oct. 17, 2022). Imposing a but-for causation requirement "would require [a] court to find that the 2010 amendment … narrowed the claims that may be subject to FCA liability," a notion which runs directly counter to the legislative history. *See U.S. ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 12-CV-10601-IT, 2018 WL 1996829, *5 (D. Mass. Apr. 27, 2018); *U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 41 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) ("The legislative history of the 2010 AKS amendment demonstrates that the new provision was intended to do anything but narrow existing law." (citation omitted)); *cf. United States v. Teva Pharm.*, Civ. No. 20-11548, slip

op. at 12-13 (D. Mass. July 14, 2023) (rejecting "but for" causation standard as inconsistent with First Circuit law).[8]

To the extent that the district court drew inspiration from *United States ex rel. Cairns v. D.S. Medical, LLC*, 42 F.4th 828 (8th Cir. 2022), such reliance is seriously misplaced. In *Cairns* (decided after a trial in which the government relied solely on the 2010 amendments as to liability, *id.* at 833), the Eighth Circuit itself characterized its holding as "narrow," applying only "when a plaintiff seeks to establish falsity or fraud through the 2010 amendments." *Id.* at 836. The court remanded, refusing to enter judgment for the defendants because the government had sufficiently proved causation under the correct standard, sending the case to the jury with the correct jury instruction on causation. *Id.* at 837 n.3. Because the FAC

---

[8] In *Teva*, the court found "more than sufficient" to establish a causal connection at the summary judgment stage evidence that Teva had intended to induce Copaxone prescriptions by helping Medicare patients who need assistance with co-pays, along with contemporaneous emails and other documents showing that Teva knew it would have lost Copaxone sales if it did not provide assistance to those patients. *Id.*; *see also Heller v. Guardian Pharmacy*, 521 F. Supp. 3d 1254, 1276 (N.D. Ga. 2021) (relator's allegation that at least one patient was exposed to a quid pro quo, with a claim resulting, is sufficient to withstand a motion to dismiss). "[A] sufficient causal link between the alleged overpayment from defendants to the [physicians] and the claims later submitted" can be inferred from "evidence that the very physicians who allegedly received money from Defendants . . . later used Defendant's facilities . . . [to] perform[] hundreds of surgeries on patients." *Kuzma v. N. Ariz. Healthcare Corp.*, 607 F. Supp. 3d 942, 957 (D. Ariz. 2022). In *Kuzma*, the court concluded that this was sufficient to provide "the link . . . [that] patients in this case were actually exposed to compromised professional judgment." *Id.*

alleges Fresenius conduct which began in approximately 2007, Relator intends to proceed under both the statute and the pre-2010 case law, which precludes the application of a but-for causation standard such as that applied by the district court here. App. 749-50, 754, 757-58, 784, 795, 847 (FAC ¶¶ 85, 89, 97, 108, 179, 201, 332).

Fresenius may rely upon the Sixth Circuit's decision in *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043 (6th Cir. 2023), but *Martin*'s reasoning is severely undercut by this Court's precedents. *Martin* rejected *Greenfield*'s application of legislative history as being "of little assistance" because "we generally do not consider legislative history in construing a statute with criminal applications." *Id.* at 1054. But this Court has done exactly that on numerous occasions, including in analyzing the FCA, which also has criminal applications. *See, e.g.*, *United States v. Bay State Ambulance,* 874 F.2d 20, 30-31 (1st Cir. 1989) (analyzing the legislative history of the AKS); *Guilfoile,* 913 F.3d at 190-91 (same); *see United States v. Millenium Lab'ys, Inc*., 923 F.3d 240, 244-45 (1st Cir. 2019) (analyzing legislative history of the FCA).

In any event, Relator has, in fact, satisfied even the district court's exacting standard, by alleging specific compensation relationships with specific physicians which were intended to and did result in referrals. *See supra* pp. 10-13. Even if the Court were to look just at a single transaction, as permitted by *Escobar*, what is

alleged with respect to Dr. Tilles meets that burden at the pleading stage. Dr. Tilles'
medical director contract with Fresenius, for which he was paid $178,000, was
"critical" to referrals in his area. App. 787 (FAC ¶ 188). Fresenius closely tracked
Dr. Tilles' referrals and his contributions to Fresenius' earnings. App. 813 (FAC ¶
239-40). These allegations provide the causal link even under the onerous standard
the district court demanded.

For all the foregoing reasons, the Court should reverse the district court's
dismissal of the FAC.

## II.    AT A MINIMUM, THIS COURT SHOULD REVERSE THE DISTRICT COURT'S ORDER DENYING LEAVE TO AMEND.

When a motion for leave to amend is filed prior to entry of final judgment, the
district court evaluates the motion under Rule 15(a)(2). Pursuant to that standard,
absent any "apparent or declared reason—such as undue delay, bad faith or dilatory
motive on the part of the movant, repeated failure to cure deficiencies by
amendments previously allowed, undue prejudice to the opposing party by virtue of
allowance of the amendment, futility of amendment, etc.," *Amyndas Pharms. v.
Zealand Pharma A/S*, 48 F.4th 18, 36 (1st Cir. 2022) (quoting *Foman v. Davis*, 371
U.S. 178, 182 (1962)), leave to amend is "ordinarily granted freely." *In re Genzyme
Corp. Sec. Litig.*, 754 F.3d 31, 46 (1st Cir. 2014); *see also* Fed. R. Civ. P. 15(a)(2)
("The court should freely give leave when justice so requires.").

"A motion for leave to file an amended complaint 'requires that a court examine the totality of the circumstances and exercise sound discretion in light of the pertinent balance of equitable considerations.'" *Amyndas*, 48 F.4th at 37 (quoting *Quaker State Oil Ref. Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1517 (1st Cir. 1989)). That includes whether a proposed amendment is a first attempt or a "serial amendment[]." *Id.* at 38. "[T]he 'when justice so requires' standard of Rule 15(a) puts a thumb on the scale in favor of allowing amendments in non-frivolous cases." *Id.* at 39.

Ordinarily, where delay is at issue, this Court denies leave to amend only if the delay results in tangible prejudice, such as "a reopening of discovery with additional costs, a significant postponement of trial [or] a likely major alteration in trial strategy and tactics." *Acosta-Mestre v. Hilton Int'l of P.R., Inc*., 156 F.3d 49, 52 (1st Cir. 1998); *accord Klunder v. Brown Univ*., 778 F.3d 24, 34-35 (1st Cir. 2015) (collecting cases.). The only exception is when the moving party unduly delays in seeking leave to amend, in which case prejudice is presumed. *Hagerty ex rel. U.S. v. Cyberonics, Inc.*, 844 F.3d 26, 34 n.7 (1st Cir. 2016); *accord Hayes v. New Eng. Millwork Distribs., Inc*., 602 F.2d 15, 19 (1st Cir. 1979).

Here, the district court denied leave to amend, stating that the case was "nearly nine years old," had been subject to "extensive delays," and there was "obvious prejudice to defendant." Add. 38. That ruling was an abuse of discretion as it reflects

both "an incorrect legal rule" and the district court's "clear error of judgment in assaying" the appropriate factors. *Waste Mgmt.*, 208 F.3d at 295.

The district court failed to identify any actual prejudice to Defendant, or note any undue delay, such that denial of leave to amend was justified. Nor is there evidence "apparent on the record" that would support denial of leave to amend on either of those grounds. *See LaRocca v. Borden, Inc.*, 276 F.3d 22, 32 n.9 (1st Cir. 2009) (quoting *Grant v. News Group Boston, Inc.*, 55 F.3d 1, 5 (1st Cir.1995)). Accordingly, this Court should reverse the denial of leave to amend.

The record does not permit a finding that amendment would prejudice Defendant. No discovery has taken place, there is no trial date, and the proposed amendments (which seek only to add details regarding 71 particular false claims) will not affect Defendant's trial strategy. The district court erred, therefore, in assuming that Defendant was prejudiced merely because the case "is now nearly nine years old." Add. 38; *cf. Klunder*, 778 F.3d at 35.

Instead of prejudice to Defendant, the district court focused on its own "time and resources" in assessing the motion to dismiss. The district court chastised Relator for waiting to amend until after the motion to dismiss was decided, noting that "[t]he Court does not sit as a sort of 'super-lawyer' here to correct counsel's errors and omissions." Add. 39. But "[t]he mere fact that [plaintiff's] motion for leave to amend came after the district court dismissed the original complaint is not

sufficient to ground a conclusion that the motion was unduly delayed." *Amyndas*, 48 F.4th at 38-39. Here, Relator did not have the needed claims data for amendment until after the district court granted the motion to dismiss. Thus, the circumstances here are unlike cases in which plaintiffs deliberately wait for a court's ruling prior to seeking leave to amend, which might weigh against granting leave to amend. *See ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008) (affirming denial of leave to amend where plaintiff, "having the needed information, deliberately wait[ed] in the wings for a year and a half with another amendment" in the event the first complaint was held insufficient); *see also Palmer v. Champion Mortg.*, 465 F.3d 24, 30-31 (1st Cir. 2006) (affirming denial of leave to amend on the basis of previously available information).

Moreover, where leave to amend is sought to present newly discovered evidence, delay is judged not by how long the case has been pending, but on "what the movant knew or should have known and what he did or should have done." *In re Lombardo*, 755 F.3d 1, 3-4 (1st Cir. 2014) (citation and internal quotation marks omitted). Whether there is undue delay is measured from the time the moving party "become[s] aware of a need to amend, such as the filing of a motion to dismiss, *a dismissal order, or the discovery of new information* that substantially alters the substance or viability of the claims." *Amyndas*, 48 F.4th at 37 (emphasis added).

Thus, the determination of undue delay requires a more nuanced approach. *See id.*; *accord Mullin v. Balicki*, 875 F.3d 140, 151 (3d Cir. 2017). "As there is no presumptive period in which . . . delay becomes undue, the question of undue delay requires that [the court] focus on the movant's reasons for not amending sooner while bearing in mind the liberal pleading philosophy of the federal rules." *Id.* (footnotes, citations, and internal quotation marks omitted). For delay to be "undue," the "period of delay must be both substantial *and* unjustified." *Amyndas*, 48 F.4th at 37 (emphasis added).

Here, any delay was neither substantial, nor unjustified. Much of the time that the district court characterizes as "delay" is attributable to the government's six-year investigation during which the case was under seal. Add. 37. After that, another two years were consumed by Defendant's motion to transfer and a second motion to dismiss in the transferee venue. Add. 37-38. Relator can hardly be held responsible for these delays. In any event, the length of time this case has been pending says nothing about whether Relator unduly delayed in seeking leave to amend. *See Mullin*, 875 F.3d at 157.

There was no undue delay here because the claims data Relator sought to include in the amended complaint had been unavailable from any public sources. Relator's counsel was able to find a non-public source for such data only *after* the district court ruled on the motion to dismiss. App. 884 (ECF 47-1 at ¶ 11). Fresenius

has not argued to the contrary. Indeed, this Court has often recognized relators' inability to allege specific false claims because healthcare claims data is generally not publicly available. *See, e.g.*, *Karvelas*, 360 F.3d at 229; *Ge*, 737 F.3d at 124. Instead, healthcare claims data is "peculiarly within the defendant's control." *See, e.g.*, *New Eng. Data Servs., Inc. v. Becher*, 829 F.2d 286, 292 (1st Cir. 1987).

Relator's counsel described in an affidavit how Relator obtained the data and why it had not been available earlier. App. 883-85 (ECF 47-1, ¶¶ 10-13). Once Relator obtained the necessary claims data, Relator moved to amend two days later. App. 869. In short, the record fully supports Relator's position that he could not have moved to amend any earlier, and thus there was no undue delay that would justify the district court's denial of leave to amend. *See City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 36 (1st Cir. 2022) (leave to amend for newly discovered evidence should be granted if plaintiff shows he "could not in the exercise of reasonable diligence have obtained [the] new evidence earlier" (alteration in original) (quoting *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 46 (1st Cir. 2017))). Two days is "well short of the timeframes that . . . [the First Circuit has] identified as undue and cannot, under all the circumstances be characterized as substantial." *Amyndas,* 48 F.4th at 38 (twenty-eight days does not constitute undue delay); *cf. Kay v. N.H. Democratic Party*, 821 F.2d 31, 34 (1st Cir. 1987) (three months constitutes undue delay).

50

The district court suggested that Relator's motion to amend was untimely because "[i]t should have been obvious from the beginning that relator would be required to *prove* that false claims were submitted to the government, and that those claims would have to be *proved* with particularity under Fed. R. Civ. P. 9(b)." Add. 38 (emphases added). In the court's view, therefore, Relator inexcusably waited to cure a known deficiency until after the court ruled. *Id.* What was not obvious, however, was that the district court would require Relator to *plead* the submission of a specific false claim from a specific physician resulting from the payment of kickbacks, a level of particularity that is substantially more demanding than this Court's precedent requires, *see supra* pp. 18-20, or that the district court would require Relator to *plead* the submission of false claims for (a)(1)(B) claims, even though a plaintiff need not prove that such claims were actually presented, *see supra* pp. 32-40. Relator cannot be faulted for failing to cure a "deficiency" about which he could not have known prior to the district court's ruling. *Amyndas*, 48 F.4th at 37 (whether delay is undue depends in part on when "a party would become aware of a need to amend"); *id.* at 38 (where plaintiff's complaint does not contain "an obvious defect," it may be reasonable "to wait until the district court rule[s] on the motion to dismiss before moving to amend").

On this set of facts, the earliest Relator could have known of this deficiency was when the court granted the motion to dismiss on December 3, 2022. Relator

moved to amend a little over six weeks later, two days after receiving the non-public claims data. That does not constitute undue delay. *Amyndas* 48 F.4th at 37 ("Amyndas had a valid reason for moving to amend: the district court had pointed out a fatal flaw in its original complaint . . . .").

Moreover, the district court gave no weight to the fact that the FAC "was the first time that [Plaintiff's] claims were subject to a Rule 9(b) sufficiency analysis." *U.S. ex rel. Frazier v. Iasis Healthcare Corp.*, 392 F. App'x 535, 538 (9th Cir. 2010); *accord Nikitine v. Wilmington Tr. Co.*, 715 F.3d 388, 390 (1st Cir. 2013) ("Whether the plaintiff, by rule or court order, had a prior opportunity to amend is one data point to be taken into account."). Thus, this was not a case of "repeated failure[s] to cure deficiencies," as might justify denial of leave to amend. *Foman*, 371 U.S. at 182.

In sum, the record provides no basis for finding prejudice to Defendant, or that Relator "unduly delayed" in seeking in leave to amend. Thus, in a manner that was inconsistent "with the federal courts' longstanding policy favoring resolution of disputes on the merits," the district court abused its discretion in denying leave to amend. *Amyndas*, 48 F.4th at 36; *see also Foman*, 371 U.S. at 182.

## CONCLUSION

For the foregoing reasons, this Court should reverse the dismissal of Relator's complaint for failure to satisfy Rule 9(b). In the alternative, this Court should reverse

the dismissal of Counts II and III. At a minimum, this Court should also reverse the

Court's denial of leave to amend.

Respectfully submitted,

Dated: July 31, 2023

W. Scott Simmer
Noah M. Rich
Baron & Budd, P.C.
600 New Hampshire Ave., NW
10th Floor
Washington, DC 20037
(202) 333-4562

Jamie Michele Bennett
Bennett Law
8 Creek Side Ct.
Middle River, MD 21220

Christopher P. Sullivan
Pamela E. Berman
Robins Kaplan LLP
800 Boylston Street, Suite 2500
Boston, MA 02199
(617) 267-2300

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1.    This pleading complies with the type-volume limitation of Federal
      AppellateProcedure 32(a) and Federal Circuit Rule 32(a).

      This pleading contains 12,873 words, excluding the parts of exempted by
      Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.    This pleading complies with the typeface requirements of Federal Rule
      ofAppellate Procedure 32(a)(5) and the type style requirements of
      Federal Rule of Appellate Procedure 32(a)(6).

      This pleading has been prepared in a proportionally spaced typeface using
      Microsoft Word in 14-point font, Times New Roman.


_____
W. Scott Simmer
Attorney for Plaintiff-Appellant


Dated: July 31, 2023_____

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 31, 2023, a true and correct copy of the foregoing

Brief was electronically served on this Court and counsel via ECF.

By: _____
W. Scott Simmer
Attorney for Plaintiff-Appellant

---

ADDENDUM

---

PAGE

Order Granting Defendant's Motion to Dismiss (ECF 40)...........1

Order Denying Relator's Motion for Leave to File a
Second Amended Complaint (ECF 56)......................................37

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
UNITED STATES ex rel.                           )
MARTIN FLANAGAN,                                )
                                                )
            Plaintiff-Relator,                  )
                                                )          Civil Action No.
        v.                                      )          21-11627-FDS
                                                )
FRESENIUS MEDICAL CARE                          )
HOLDINGS, INC., d/b/a                           )
FRESENIUS MEDICAL CARE                          )
NORTH AMERICA,                                  )
                                                )
            Defendant.                          )
_____)

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

SAYLOR, C.J.

        This is a *qui tam* action alleging violations of the Anti-Kickback Statute, 42 U.S.C. §

1320a-7b, and False Claims Act, 31 U.S.C. §§ 3729 et seq., by a company that provides dialysis

services to patients with kidney failure.  Relator Martin Flanagan has brought suit against

defendant Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America

("FMCNA"), alleging that FMCNA improperly provided free or below-cost services to hospitals

and physicians, and made various types of improper payments to physicians, in exchange for

referrals to its dialysis clinics.  The complaint alleges that FMCNA violated the Anti-Kickback

Statute ("AKS") and caused the submission of false claims for payment to Medicare, Medicaid,

and other government health-care payors.

        FMCNA has moved to dismiss the complaint for failure to state a claim upon which relief

can be granted pursuant to Fed. R. Civ. P. 12(b)(6) and for failure to allege fraud with

particularity as required by Fed. R. Civ. P. 9(b).

The False Claims Act permits relators to reap substantial awards for reporting false claims to the government—in this case, the relator could conceivably recover billions of dollars if his allegations are proved.  The statute has a variety of strict requirements, however, that serve both to ensure that the government has a fair opportunity to control the litigation and to screen out claims that are incomplete, redundant, or parasitic.  Here, the motion to dismiss presents three sets of issues, all arising from the strict requirements for pleading such claims.

The first issue is whether relator complied with the requirements of the False Claims Act to notify the government of his claims prior to filing suit.  *See* 31 U.S.C. § 3730(b)(2).  Relator did comply with that requirement before filing his original complaint, which was 22 pages long and described an illegal scheme with two essential components.  He did not do so, however, before filing his amended complaint, which is 147 pages long and contains a number of substantially new allegations of different components of the scheme.  Because he did not present those new claims to the government, that portion of the amended complaint alleging false claims based on that conduct will be dismissed.

The second issue is whether the public-disclosure bar of the statute precludes all or any of the claims—that is, whether relator is filing suit concerning matters that had been previously disclosed to the public.  *See* 31 U.S.C. § 3730(e)(4)(A).  Under the circumstances, the Court concludes that the bar does not apply.

The third, and perhaps most difficult, issue is whether the amended complaint pleads fraud with sufficient particularity to meet the requirements of Fed. R. Civ. P. 9(b).  As is often the case with *qui tam* actions, the issue is not whether the complaint alleges an unlawful scheme—it does, in considerable detail—but whether it actually pleads a violation of the False

2

2

Claims Act.  To do so, the complaint must both allege the existence of a scheme to defraud and identify particularized false claims.  It is insufficient to allege a scheme and then to make generalized allegations that the scheme must have, as a matter of logic, resulted in false claims.

Here, despite its length, the amended complaint does not describe a single particular false claim.  Instead, it alleges that FMCNA paid kickbacks for referrals on a widespread basis, and that therefore "all" claims for payment that it submitted to the government were false.  It also provides a very limited amount of statistical evidence to attempt to bolster those allegations.  The central issue is whether relator can sidestep the requirement to plead false claims with particularity by alleging that every single claim is necessarily false.  Under the circumstances presented here, the Court concludes that he cannot.

Accordingly, and for the following reasons, the motion to dismiss will be granted.

I.     **Background**

Unless otherwise noted, the following facts are alleged in the amended complaint.

A.     **The Parties**

FMCNA is a wholly-owned subsidiary of Fresenius Medical Care AG & Co. KGaA, which is located in Bad Homburg, Germany.  (Am. Compl. ¶ 13).  FMCNA is headquartered in Waltham, Massachusetts.  (*Id.*).  It employs more than 40,000 employees and treats nearly 190,000 patients at approximately 2,400 outpatient clinics in the United States, including 39 in Massachusetts.  (*Id.*).  It also contracts with hospitals to provide dialysis services on an outpatient basis.  (*Id.*).

Martin Flanagan is a resident of Texas.  (*Id.* ¶ 11).  He was employed by Fresenius for 29 years.  (*Id.*).  His last title was Director of Acute Market Development for the Fresenius Western Business Unit.  (*Id.*).  In that role, he was responsible for, among other duties, negotiating

contracts under which FMCNA provided dialysis treatment to hospital inpatients.  (*Id.*).

      **B.**      <u>**Factual Background**</u>

      Chronic kidney disease refers to the progressive loss of a person's kidney function, which is normally irreversible.  (*Id.* ¶ 14).  End-Stage Renal Disease ("ESRD") is the stage of advanced kidney impairment that requires either continued dialysis treatments or a kidney transplant to sustain life.  (*Id.* ¶ 15).  Dialysis refers to a treatment regimen aimed at artificially replacing some of the functions performed by a healthy kidney.  (*Id.* ¶ 17).  According to the United States Renal Data System, there were approximately 746,557 ESRD patients in the United States at the end of 2017.  (*Id.* ¶ 15).  Roughly 90% of all dialysis patients undergo hemodialysis at a dialysis clinic three times per week.  (*Id.* ¶ 18).  FMCNA is America's largest dialysis-services provider. (*Id.* ¶ 13).

      Medicare is a federally-funded health-insurance program that primarily provides benefits to the elderly, but also provides coverage to patients with ESRD, regardless of age.  (*Id.* ¶ 19). The Medicare ESRD program is administered through the Centers for Medicare & Medicaid Services ("CMS"), an agency within the Department of Health and Human Services ("HHS"). (*Id.* ¶ 25).  Since 1972, Medicare has been the primary payor for more than 80% of the cost of dialysis treatment for nearly 800,000 ESRD patients in the United States.  (*Id.* ¶ 22).  ESRD expenditures by Medicare exceed $40 billion annually.  (*Id.* ¶ 23).

      According to the complaint, FMCNA clinics and other providers treating ESRD submit to the government one reimbursement claim bill per month for each patient, including the charges for several dialysis treatments, any separately billable laboratory services, and separately billable drugs.  (*Id.* ¶ 28).

      Medicaid is a state-administered program where each state sets its own guidelines

concerning eligibility and services, with funding coming jointly from the states and the federal government.  (*Id.* ¶ 38).  In many states, Medicaid pays for treatment costs for ESRD patients who do not qualify for Medicare and/or pays for the 20% of treatment costs not covered by Medicare.  (*Id.* ¶ 45).  Submission of claims to Medicaid that were ineligible for payment because of violation of the AKS are actionable under the FCA because the payments of those claims were made with federal funds.  (*Id.* ¶ 44).

In addition to Medicare and Medicaid, CHAMPUS/TRICARE, which is administered by the United States Department of Defense, provides ESRD benefits to health-care programs for individuals and dependents affiliated with the armed forces and to covered beneficiaries.  (*Id.* ¶ 35).  CHAMPVA, which is administered by the United States Department of Veterans Affairs, is a health-care program for families of veterans with 100% service-connected disabilities and provides ESRD benefits to covered beneficiaries.  (*Id.*).

### C.    FMCNA's Allegedly Improper Conduct

The complaint alleges various methods by which FMCNA improperly induced the referral of patients to its dialysis clinics.  First, it alleges that FMCNA offered remuneration to hospitals in two ways:  by entering into contracts that provided no-cost and/or below-cost inpatient dialysis services, and by providing "significant" free services, including free discharge-planning services, free in-service training to staff, free training to patients, and free quality assessment and improvement data analysis to hospitals.  (*Id.* ¶¶ 81-166).  Second, it alleges that FMCNA engaged in improper remuneration relationships with physicians who served as medical directors in its outpatient clinics in five ways:  by selecting medical directors based on their expected and historical referrals; by paying them above-market compensation to reward referrals; by making no effort to report or verify their hours; by tracking their referrals to make

sure they were not making referrals to competitors; and by requiring them to sign onerous non-compete agreements to lock them into their arrangements with FMCNA.  (*Id.* ¶¶ 167-307).  Third, it alleges that FMCNA provided physicians free or below-cost practice-management services.  (*Id.* ¶¶ 308-20).  Fourth, it alleges that FMCNA entered into favorable leases with medical directors that paid them above-market rates.  (*Id.* ¶¶ 321-31).  Fifth, it alleges that FMCNA entered into favorable joint-venture agreements ("JVAs") with physician groups to induce them to make referrals.  (*Id.* ¶¶ 332-75).

### 1.    <u>Hospital Services</u>

According to the complaint, over the past two decades, the dialysis industry has become increasingly concentrated in the hands of two companies:  DaVita and FMCNA.  (*Id.* ¶ 84).  Beginning in approximately 2007, FMCNA allegedly realized that the company's "organic growth" (that is, growth from adding new patients and not through acquisitions) was almost non-existent.  (*Id.* ¶ 85).  FMCNA decided that one of the keys to capturing new patients for its dialysis clinics was through its relationships with hospitals providing inpatient acute care.

### a.    <u>Below-Cost Dialysis Services</u>

The complaint alleges that FMCNA made a calculated business decision to offer inpatient dialysis services to hospitals at prices well below cost in order to capture referrals of discharged patients to its dialysis clinics.  (*Id.* ¶ 83).  Flanagan and his colleagues were allegedly instructed by their superiors to obtain hospital contracts "at any cost" to secure the referrals of discharged patients.  (*Id.* ¶ 88).  Bonuses and performance evaluations for mid-level managers were tied, in part, to patient growth and the increase in number of treatments at individual clinics.  (*Id.* ¶ 89).

According to the complaint, FMCNA budgeted for the anticipated losses in the acute programs at many of the larger hospitals.  (*Id.* ¶ 90).  Internal spreadsheets from the Western

Business Unit show that FMCNA recorded losses on its contracts with hospitals, often in excess of the budgeted losses. (*Id.* ¶¶ 91, 93). Although the budgetary spreadsheets were reviewed and approved by mid-level and upper management, the complaint alleges that the decision to run hospital programs at a loss was made by corporate management. (*Id.* ¶ 93). It alleges that Flanagan and colleagues were directed by their superiors to pursue contracts even when they resulted in losses. (*Id.* ¶¶ 97-106). And it further alleges that Flanagan was instructed not to enforce "escalator" clauses, which called for annual fee increases of up to 4.0%. (*Id.* ¶¶ 110-11).

### b.    Free Services to Hospitals and Patients

The complaint alleges that FMCNA provided free discharge-planning services to hospitals, free in-service training to staff, free training to patients, and free quality assessment and improvement program data analysis. (*Id.* ¶ 128). FMCNA also established the Bridge Program, allegedly to "help hospitals save money by streamlining the process for patient discharge from the hospital and admission to a chronic facility for dialysis." (*Id.* ¶ 131). The complaint alleges that the Bridge Program was actually designed to capture all of a hospital's referrals, as "about half of the company's patients came into [FMCNA] clinics via [the discharge planning process]." (*Id.* ¶¶ 132, 140). FMCNA tracked the referrals recorded as part of the Bridge Program. (*Id.* ¶ 162). It alleges that although FMCNA directed that "all services provided under the Bridge Program must be provided at FMV," Flanagan was never required to obtain an FMV analysis for any hospital contract or for Bridge Program services during his tenure with the company. (*Id.* ¶¶ 142-43). Instead, those services were provided free of charge. (*Id.*).

### 2.    Medical Director Compensation

By law, all outpatient dialysis clinics must have a qualified medical director "to be

responsible for the delivery of patient care and outcomes in the facility."  42 C.F.R. § 494.150; Am. Compl. ¶ 170.  Medical directors are not FMCNA employees, but physicians in private practice.

The complaint alleges that FMCNA engaged in improper remunerative relationships with medical directors in its outpatient clinics to capture their referrals.  (Am. Compl. ¶¶ 167-69)  It alleges that FMCNA courted nephrologists in multi-physician private practices with high numbers of patients to be medical directors, often offering to pay them more than $100,000 annually in exchange for patient referrals.  (*Id.* ¶ 176).

According to the complaint, FMCNA pitched medical-director positions to nephrologists as a way "to earn a considerable income for little or no investment of time."  (*Id.* ¶ 181).  A medical director's "productivity" was tracked, and contracts with medical directors who generated a large number of patients were renewed.  (*Id.* ¶¶ 184-97).  Patients who were referred to non-FMCNA clinics were categorized as "leakage."  (*Id.* ¶ 217).  FMCNA generated reports to track which medical directors and their practice groups referred patients to outside clinics and the reasons why.  (*Id.*).

The complaint further alleges that FMCNA paid its medical directors far above fair market value.  (*Id.* ¶¶ 198-205).  For example, medical directors at 160 FMCNA clinics made more than $300,000 in 2019, well above the average compensation of medical directors at similarly located clinics.  (*Id.*).  And even though the regulatory guidance defines the medical-director position as occupying 0.25 FTE, the complaint alleges that FMCNA neither tracked nor enforced medical directors' hours spent on duties to their clinics.  (*Id.* ¶¶ 172, 206-13).

Finally, the complaint alleges that medical directors were required to sign agreements containing non-competition provisions in order to preclude any medical director and those in the

same practice group from engaging in any remunerative relationship with another dialysis company.  (*Id.* ¶ 223).  Physicians who wanted to terminate the non-competition agreements were forced to negotiate onerous buyouts.  (*Id.* ¶ 228).

### 3.   Free or Below-Cost Management Services

The complaint further alleges that FMCNA provided free or below-cost services to physicians to secure referrals.  (*Id.* ¶¶ 308, 321).  According to the complaint, FMCNA offered physicians the opportunity to enter into free practice-management agreements, in return for which it obtained the practice's data from the prior three to five years.  It then used that data to identify physicians and practice groups to target for medical director positions and joint-venture agreements.  (*Id.* ¶¶ 308-14).

### 4.   Favorable Leases

According to the complaint, FMCNA also paid physician groups rent above fair market value and provided leases below fair market value in order to secure referrals.  (*Id.* ¶ 331).

### 5.   Joint-Venture Agreements

Finally, the complaint alleges that FMCNA entered into joint-venture agreements with physicians in order to induce referrals to the joint-venture clinic.  (*Id.* ¶ 332).  According to the complaint, FMCNA paid inflated amounts for controlling interests in the joint venture while selling shares below fair market value to physicians who were in a position to make referrals. (*Id.* ¶¶ 334-35).  Moreover, referral sources were routinely permitted to own more than 40% of the joint venture investment, contrary to HHS OIG guidance.  (*Id.* ¶¶ 332-36).  The complaint further alleges that FMCNA would typically pay high-performing physicians 10 to 12% of the clinic's topline revenue, whereas it would pay lower-performing physicians up to 6% of topline revenue.  (*Id.* ¶ 343).  FMCNA also inserted non-competition clauses into their JVAs in order to

lock partners into referring patients to its facility.  (*Id.* ¶¶ 368-74).

### D.    Procedural Background

Flanagan filed the original complaint on March 6, 2014, alleging presentation of false claims in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (Count 1); making or using false records material to a false or fraudulent claim in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (Count 2); and conspiring to present false claims and making or using false records material to a false or fraudulent claim in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C) (Count 3).  Essentially, that version of the complaint alleged that FMCNA's efforts to incentivize referrals to its clinics violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the resulting claims to Medicare were tainted by illegal kickbacks in violation of the False Claims Act.

After a review of the claims, the government declined to intervene.  FMCNA then moved to dismiss the complaint.  In response, relator filed an amended complaint.

FMCNA has moved to dismiss the amended complaint on the grounds that (1) the amended complaint is essentially a new complaint and should therefore have been filed under seal as required by 31 U.S.C. § 3730(b)(2); (2) the claims are barred by the FCA public-disclosure bar, 31 U.S.C. § 3730(e)(4); (3) the claims concerning joint-venture agreements are barred by the FCA's first-to-file bar, 31 U.S.C. § 3730(b)(5); (4) the complaint has not pleaded fraud with particularity as required by Rule 9(b); and (5) the complaint fails to state a claim for FCA conspiracy.

## II.    Standard of Review

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom."  *Ruiz v. Bally Total Fitness*

*Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir.

1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its

face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must

be enough to raise a right to relief above the speculative level . . . on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set

forth "factual allegations, either direct or inferential, respecting each material element necessary

to sustain recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301,

305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1,

6 (1st Cir. 2005)).

Under Rule 9(b), the standard for allegations of fraud is higher than the normal pleading

standard.  To survive a motion to dismiss, a complaint alleging fraud must "state with

particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

## III.   <u>The Regulatory Framework</u>

The False Claims Act, 31 U.S.C. §§ 3729-33, provides for civil liability for anyone who

"knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement

material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A), (a)(1)(B).  A "claim" is "any

request or demand . . . for money or property" presented to an officer, employee, or agent of the

United States.  31 U.S.C. § 3729(b)(2).  Private persons, known as relators, can file civil *qui tam*

actions on behalf of the United States against persons or entities who violate the act.  *Id.*

§ 3730(b).  The government can intervene in a *qui tam* action and assume primary responsibility over it.  *Id.* § 3730(b)(2), (b)(4), (c)(1).  The relator is eligible to collect a portion of any damages awarded in a *qui tam* action, whether or not the government intervenes.  *Id.* § 3730(d).

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, states that "whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase . . . or recommend purchasing . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program" shall be guilty of a felony.  42 U.S.C. § 1320a-7b(b)(2).  In 2010, Congress amended the AKS to clarify that any Medicare claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for the purposes of [the FCA]."  42 U.S.C. § 1320a-7b(g); Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010).  In other words, "an AKS violation that results in a federal health care payment is a per se false claim under the FCA."  *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) (quoting *U.S. ex rel. Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017)).

## IV.  <u>Analysis</u>

### A.  <u>Mandatory Pre-Suit Requirements</u>

Defendant contends that the amended complaint should be dismissed for failure to comply with the pre-suit requirements of the FCA, 31 U.S.C. § 3730(b)(2).

Under the FCA, a relator must comply with the following requirements:

> A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government . . . .  The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders.  The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and

information.

31 U.S.C. § 3730(b)(2).

Those notification requirements were enacted "to allow the Government an adequate opportunity to fully evaluate the private enforcement suit and determine both if that suit involves matters the Government is already investigating and whether it is in the Government's interest to intervene and take over the civil action." *United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 998-99 (2d Cir. 1995) (quoting S. Rep. No. 99-345, 1986 U.S.C.C.A.N. 5266, 5289). "A secondary objective was to prevent defendants from having to answer complaints without knowing whether the government or relators would pursue the litigation." *Id.* at 999. Accordingly, "[f]ailure to comply with these mandatory threshold requirements warrants dismissal of the *qui tam* complaint with prejudice." *United States ex rel. Stevens v. Vermont Agency of Nat. Res.*, 162 F.3d 195, 200 (2d Cir. 1998) (*rev'd on other grounds*, 529 U.S. 765 (2000)).

If the government declines to intervene and the *qui tam* case is unsealed, further proceedings are governed by 31 U.S.C. § 3730(c)(3). That statute provides:

> If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

31 U.S.C. § 3730(c)(3).

The policy behind that requirement—allowing the government to investigate the claims and decide whether to intervene—is implicated when a relator amends a complaint to add completely new FCA claims. *See East Bay Mun. Util. Dist. v. Balfour Beatty Infrastructure,*

*Inc.*, 2014 WL 2611312, at *2 (N.D. Cal. June 11, 2014). Courts have therefore required relators to abide by those requirements when filing an amended complaint that is not "substantially similar" to the original complaint. *Id.* at *3 (collecting cases). For example, in *United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.*, 750 F.3d 111 (1st Cir. 2014), the First Circuit affirmed the denial of a motion to amend the complaint a third time. 750 F.3d at 120. The proposed amendments in that case were completely new allegations from a new *qui tam* plaintiff. *United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.*, 2011 WL 2462469, at *6-7 (D. Mass. June 16, 2011). The district court had found that the relators had violated the filing and service requirements of the FCA because the new allegations were not substantially similar to those in the original complaint. *Id.* In affirming that decision, the First Circuit stated that "the new paragraphs in the [p]roposed [complaint] were attributable to the new relator and . . . they [therefore] violated the FCA's filing and service requirements." *Wilson*, 750 F.3d at 120.

Here, the original complaint was 22 pages long and contained 54 numbered paragraphs. The description of the alleged scheme consisted of 25 paragraphs. Of those, thirteen described a scheme "to offer dialysis services to hospitals well below cost in order to capture referrals." (Compl. ¶ 26). Another six described a scheme involving "improper remuneration relationships with physicians who serve as medical directors at Fresenius clinics." (*Id.* ¶ 39). It alleged that "[t]hese problematic physician relationships generally break down into two areas." (*Id.*). The first was that "these physicians were generally paid in excess of fair market value for the services they actually rendered." (*Id.*). The second was that "these same doctors are often provided with opportunities to rent office space that they own to Fresenius at above or at the very top of fair market value," with guaranteed long-term leases that are "not commercially reasonable." (*Id.*

14

¶ 40).[1]

The original complaint referred to joint-venture agreements between FMCNA and physicians, but only in order to contrast such agreements (which it referred to as a product of "arms-length negotiations") with the higher compensation paid to medical directors in the absence of such agreements.  (*Id.* ¶ 41 ("The fact that medical director compensation is lower where the physician actually shares the cost of his or her compensation through his or her joint venture (ownership) agreement shows that where there are arms-length negotiations between two more or less equal parties, a lower compensation rate results.")).  It did not allege that FMCNA improperly provided free services to hospitals and patients in the form of free discharge-planning services, free in-service training to staff, free training to patients, and free quality assessment and improvement program data analysis, nor did it mention the Bridge Program.  And it did not allege that FMCNA provided free or below-cost practice-management services to physicians.

The initial complaint has since been amended to add 125 pages of allegations, including multiple new claims.  Defendant correctly contends that the initial complaint did not contain any allegations concerning unlawful joint-venture agreements, or the provision of free services to hospitals, physicians, and patients.  The portions of the claims based on those allegations will therefore be dismissed for failing to comply with the FCA's pre-suit requirements.

Defendant further contends that the original complaint did not contain any allegations concerning medical-director agreements, and that all claims based on such agreements should likewise be dismissed.  While it is true that it did not use the term "medical director agreements," its allegations concerning improper remuneration to physicians in the form of compensation

---

[1] The remaining six paragraphs describing the alleged scheme consisted of an introductory paragraph (Compl. ¶ 25) and five paragraphs addressing how the scheme resulted in false claims (*Id.* ¶¶ 45-49).

15

above fair-market value and favorable leases are nonetheless "substantially similar" to those in the amended complaint.  To the extent that the amended complaint addresses those remuneration relationships, therefore, the claims will not be dismissed.

In summary, because the new allegations concerning (1) joint-venture agreements, (2) free services to hospitals and patients, and (3) free practice-management services to physicians are not substantially similar to the allegations in the initial complaint, that portion of the complaint will be dismissed for failure to comply with the filing and service requirements of the FCA.  *See Wilson*, 2011 WL 2462469, at *7.

### B.    The Public-Disclosure Bar

Defendant next contends that the remaining FCA claims in the amended complaint are barred by the public-disclosure bar of the statute, 31 U.S.C. § 3730(e)(4)(A).

The *qui tam* provisions of the FCA permit relators, in some instances, to reap huge financial windfalls.  "Although this financial incentive encourages would-be relators to expose fraud, it also attracts parasitic relators who bring FCA damages claims based on information within the public domain or that the relator did not otherwise discover."  *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 719 F.3d 31, 33 (1st Cir. 2013) ("*Duxbury II*") (internal quotation marks and citations omitted).

To strike a balance between encouraging whistle-blowing and discouraging opportunistic behavior, the FCA contains a "public-disclosure bar."  *Id.*  The public-disclosure bar seeks to "prevent parasitic qui tam actions in which relators, rather than bringing to light independently discovered information of fraud, simply feed off of previous disclosures of public fraud."  *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 26 (1st Cir. 2009) ("*Duxbury I*").

The public-disclosure bar provides as follows:

The Court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

    i.  in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

    ii.  in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

    iii.  from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

The public-disclosure bar of § 3730(e)(4)(A) applies when "(1) a public disclosure of the allegations or transactions in a relator's complaint . . . occurred; (2) said disclosure . . . occurred in the manner which is specified in the FCA; and (3) the relator's suit [is] 'based upon' those publicly disclosed allegations or transactions."  *U.S. ex rel. Est. of Cunningham v. Millennium Lab'ys of Cal., Inc.*, 713 F.3d 662, 669-70 (1st Cir. 2013) (quoting *Duxbury I*, 579 F.3d at 21).

A prior, public disclosure of fraud occurs when the essential elements exposing the particular transaction as fraudulent find their way into the public domain.  To be a disclosure of fraud the disclosure must contain either (1) a direct allegation of fraud, or (2) both a misrepresented state of facts and a true state of facts so that the listener or reader may infer fraud.

*U.S. ex rel. Poteet v. Bahler Med., Inc.*, 619 F.3d 104, 110 (1st Cir. 2010) (internal quotation marks and citations omitted).

The statute defines "original source" as an individual who, "[1] prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions . . . ."  31 U.S.C. §

3730(e)(4)(B).

Here, defendant contends that the allegations were previously disclosed in multiple ways, including a 2005 government investigation and a 2005 Corporate Integrity Agreement ("CIA") between FMCNA and the Office of Inspector General of the Department of Health and Human Services ("OIG").

### 1.   Compensation of Medical Directors

Defendant contends that the allegations concerning the compensation of medical directors were publicly disclosed prior to the filing of the complaint.

First, defendant contends that the salaries paid to all of its medical directors is a matter of public record and is available on the website of the Center for Medicare and Medicaid Services ("CMS").  While it is true that CMS data are "reports" for the purposes of the public disclosure bar, *see U.S. ex rel. Conrad v. Abbott Lab'ys, Inc.*, No. 02-11738, 2013 WL 682740, at *5 (D. Mass. Feb. 25, 2013), the mere publication of compensation information, without an allegation of fraud or misrepresentation, is not sufficient to trigger the bar.

Second, defendant contends that a complaint alleging medical-director fraud filed in Missouri in 2005 against two different companies—both of which were later acquired by FMCNA—qualified as a public disclosure barring the current allegations.[2]  Defendant further contends that the CIA it had entered into with the OIG relating to conduct of a company FMCNA later acquired (National Medical Care) qualified as a public disclosure.

Those arguments, however, are unavailing.  The 2005 complaint alleged improper conduct dating from a decade before the conduct alleged here.  Furthermore, the defendants in

---

[2] The *qui tam* action at issue was *United States ex rel. Williams v. Renal Care Grp., et al.*, No. 4:05-cv-985 (E.D. Mo. June 21, 2005).

that case were entities that at the time were not affiliated with FMCNA.  Allegations concerning

pre-merger conduct cannot be said to have disclosed post-merger conduct.  *See U.S. ex rel.*

*Saldivar v. Fresenius Med. Care Holdings, Inc*., 906 F. Supp. 2d 1264, 1274 (N.D. Ga. 2012).

Third, defendant contends that relevant public disclosures occurred in multiple SEC

filings by FMCNA.  The SEC filings at issue state that (1) "at most of our clinics, a relatively

small number of physicians account for the referral of all or a significant portion of the patient

base," (Def. Mem. Ex. 29 at 10); (2) "compensation is negotiated individually [based on] local

factors . . . . We believe that the compensation of our medical directors is in line with the

market" (*Id.* Ex. 13 at 23); and that (3) "If physicians and other referral sources cease referring

patients to our dialysis clinics . . . our revenues would decrease." (*Id.* Ex. 29 at 10).[3]

In *United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*, 551 F.

Supp. 3d 27, 43 (E.D.N.Y. 2021), the court found that SEC filings disclosing the nature of the

joint-venture relationships and the regulatory risks associated with them were sufficient to

qualify as public disclosures.  The following is a relevant excerpt from an SEC filing cited by the

court in *CKD*:

> A number of the dialysis centers . . . we operate are owned, or managed, by joint ventures
> in which we hold a controlling interest and one or more hospitals, physicians or physician
> practice groups hold a minority interest.  Physician owners, who are usually
> nephrologists, may also provide medical director services and physician owners may
> refer patients to those centers or other centers we own and operate or to other physicians
> who refer patients to those centers or other centers we own and operate.  While we have
> structured our joint ventures to comply with many of the criteria for safe harbor
> protection under the U.S. Federal Anti-Kickback Statute, our investments in these joint
> venture arrangements do not satisfy all elements of such safe harbor.  While we have
> established comprehensive compliance policies, procedures and programs to ensure
> ethical and compliant joint venture business operations, if one or more of our joint
> ventures were found to be in violation of the Anti-Kickback Statute or the Stark Law, we

---

[3] The Court takes judicial notice of the proffered SEC filings as undisputed documents provided by the
parties in connection with a Rule 12(b)(6) motion based on the public-disclosure bar.  *United States ex rel.
Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016).

could be required to restructure or terminate them.  We also could be required to repay to Medicare amounts received by the joint ventures pursuant to any prohibited referrals, and we could be subject to criminal and monetary penalties and exclusion from Medicare, Medicaid and other U.S. federal and state healthcare programs.

(Def. Mem. Ex. 15 at 6).

That excerpt discloses that the joint ventures do not qualify for safe-harbor protection and identifies the penalties that might be imposed should the company be found to be in violation of the relevant statutes.  By contrast, here the statements in defendant's securities filings concerning medical-director agreements do not even convey the possibility that those agreements might violate the law.  Furthermore, they do not directly disclose the existence of any of the alleged schemes, or any other form of fraud, nor do they describe facts from which the existence of a fraudulent scheme might be inferred.  At most, the filings describe a set of circumstances that might be vulnerable to manipulation.

Accordingly, the public-disclosure bar does not preclude the claims concerning unlawful medical-director agreements.

### 2.      Joint-Venture Agreements

The Court has previously determined that the portion of the amended complaint that alleges claims arising out of the joint-venture agreements and the provision of free services to physicians will be dismissed for failure to comply with the pre-suit requirements of the False Claims Act.  However, even assuming compliance with those requirements, the claims concerning joint-venture agreements would be barred in any event.  Relator first alleged fraud concerning joint ventures in the amended complaint, which was filed in 2021.  Therefore, the court may consider any public disclosures made prior to 2021 for purposes of determining whether the claims are prohibited by the public-disclosure bar.

In 2014, a *qui tam* action was filed in the Eastern District of New York alleging that

FMCNA "acquired controlling interests in dialysis clinics" and paid physician owners "above-market value for their clinics and that this excess constituted payment to induce the doctors to refer patients back to these clinics." *U.S. ex rel. CKD Project v. FMCNA*, No. 14-cv-6646 (E.D.N.Y. Nov. 12, 2014) (ECF No. 1).  In substance, the complaint alleged that FMCNA engaged in a scheme to pay kickbacks to physicians with whom it had entered into joint-venture agreements.  The matter was unsealed, and therefore publicly disclosed, in 2018.  The amended complaint in this case, which was the first time relator raised any allegations concerning joint ventures, was filed three years later, in 2021.

"In assessing whether a given later-filed suit is 'based upon' publicly disclosed allegations, [courts] look to whether those allegations are 'substantially similar' to said allegations." *Cunningham*, 713 F.3d at 670.  Here, the allegations are "substantially similar" to those in *CKD* and are thus "based upon" the public disclosures.

However, even if allegations are based upon public disclosures, claims may nonetheless be asserted if the relator is an "original source."  Before 2010, the statute defined an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B) (2006).  The 2010 Patient Protection and Affordable Care Act amendment to the public-disclosure bar made two notable changes to that definition.  *See* Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119 (2010).  First, it added a second definition for "original source."  *Id.* Now, a relator may also qualify as an "original source" if "prior to a public disclosure under subsection (e)(4)(a), [he] voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based."  *Id.*  Second, the requirement for "direct"

knowledge was replaced with the requirement that a relator's knowledge must "materially add[ ]
to the publicly disclosed allegations or transactions." *Id.* Thus, the statute now defines "original
source" as an individual who

> (1) prior to a public disclosure . . . has voluntarily disclosed to the Government
> the information on which allegations or transactions in a claim are based, or (2)
> who has knowledge that is independent of and materially adds to the publicly
> disclosed allegations or transactions, and who has voluntarily provided the
> information to the government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B).

The allegations in *CKD* described a scheme whereby FMCNA allegedly paid kickbacks
to doctors with whom it had entered into joint-venture agreements. Relator's allegations here
describe the same essential scheme and do not "materially add" to those allegations. At most,
relator "merely adds detail or color to previously disclosed elements of an alleged scheme
[which] is not materially adding to the public disclosures." *United States ex rel. Winkelman v.
CVS Caremark Corp.*, 827 F.3d 201, 213 (1st Cir. 2016).

Accordingly, even if relator had complied with the pre-suit requirements of the False
Claims Act, the public-disclosure bar would preclude the claims concerning joint-venture
agreements.

### C.     The First-to-File Bar

Defendant also contends that the claims concerning joint-venture agreements are barred
by the first-to-file rule. Again, those claims will be dismissed on other grounds; however, even
if those claims survived those challenges, they are duplicative of the allegations in *CKD* and
therefore would be barred by the first-to-file rule.

The first-to-file bar provides that "[w]hen a person brings an action . . . no person other
than the Government may intervene or bring a related action based on the facts underlying the

pending action." 31 U.S.C. § 3730(b)(5).  Defendant contends that the 2014 *CKD* complaint alleged the same fraudulent scheme concerning joint-venture agreements as the amended complaint here, which was filed seven years later.  Relator responds that (1) the complaints do not allege the same essential facts and (2) the *CKD* complaint was later dismissed on jurisdictional grounds, which makes the first-to-file bar inapplicable.

The first question, for the purpose of applying the first-to-file bar, is whether the first-filed complaint "contained all the essential facts of the fraud later alleged."  *United States v. Millenium Lab'ys, Inc.*, 923 F.3d 240, 252 (1st Cir. 2019) (cleaned up).  The objective of the essential facts test is to determine whether "the statutorily required threshold for notifying the government of the fraud alleged in the later-filed suit" has been met.  *Id.* at 253.

The *CKD* complaint alleged that FMCNA used joint-venture agreements as a way to provide remuneration to physicians in exchange for referrals.  This is the same scheme with the same methodology as alleged here.  *See United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.*, 750 F.3d 111, 118 (1st Cir. 2014); *cf. Duxbury I*, 579 F.3d at 33; *United States ex rel. Westmoreland v. Amgen*, 707 F. Supp. 2d 123, 130 (D. Mass. 2010).  Moreover, the *CKD* complaint alleged that the scheme was nationwide.  (*CKD* Compl. ¶¶ 28, 38-40, 60-65).  The *CKD* complaint therefore contained the essential facts alleged here, thus barring the allegations contained in the amended complaint.

The second question is whether there is an exception to the first-to-file bar that would allow relator's pre-2010 claims to survive.  Relator relies on the Sixth Circuit's holding in *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 516-17 (6th Cir. 2009) to support the contention that when a first-filed complaint is dismissed on jurisdictional grounds, it cannot bar a later-filed complaint.  However, the First Circuit has rejected the holding in *Poteet*, explaining

that "earlier-filed complaints must provide only the essential facts to give the government sufficient notice to initiate an investigation into allegedly fraudulent practices" and emphasizing that "Section 3730(b)(5) contains no exceptions."  *United States ex rel. Heineman-Guta v. Guidant Corp.*, 718 F.3d 28, 35-37 (1st Cir. 2013).  The fact that the *CKD* complaint was dismissed on jurisdictional grounds is therefore irrelevant.

Accordingly, the claims concerning joint-venture agreements are barred by the first-to-file rule.

### D.     Pleading Fraud with Particularity under Rule 9(b)

#### 1.     Generally

Because the False Claims Act is a statute directed at fraudulent conduct, Rule 9(b) "requires both that the circumstances of the alleged fraud and the claims themselves be alleged with particularity."  *Lawton ex rel. United States v. Takeda Pharm. Co., Ltd.*, 842 F.3d 125, 130 (1st Cir. 2016); Fed. R. Civ. P. 9(b).  The complaint must "set forth with particularity the who, what, when, where, and how of the alleged fraud."  *U.S. ex rel. Ge v. Takeda Pharm. Co. Ltd.*, 737 F.3d 116, 123 (1st Cir. 2013) (internal quotation marks and citations omitted).  Where the defendant allegedly caused a third party to submit a false claim to the government, rather than submitting the false claim itself, a "more flexible" standard applies, under which Rule 9(b) is satisfied by providing "factual or statistical evidence to strengthen the inference of fraud beyond possibility without necessarily providing details as to each false claim submitted."  *U.S. ex rel. Kelly v. Novartis Pharm. Co.*, 827 F.3d 5, 13 (1st Cir. 2016) (citing *Duxbury I*, 579 F.3d at 29).  Rule 9(b) may be satisfied "where, although some questions remain unanswered, the complaint as a whole is sufficiently particular to pass muster under the FCA."  *U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009).

24

There is no "checklist of mandatory requirements that each allegation in a complaint must meet to satisfy Rule 9(b)." *Hagerty ex rel. United States v. Cyberonics, Inc.*, 844 F.3d 26, 31 (1st Cir. 2016).  Nonetheless, the First Circuit has identified some examples of specific allegations that may suffice to state a claim with the requisite particularity.  In an FCA case, these may include "details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices." *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 233 (1st Cir. 2004), *abrogated on other grounds by Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008).

### 2.  <u>The Allegations of the Complaint</u>

The amended complaint describes—in considerable detail—a multi-part scheme to compensate caregivers in return for referrals.  It identifies specific hospitals, doctors, and medical practices that have allegedly benefited financially from the scheme.

However, general allegations of illegal or fraudulent practices, without more, are not sufficient to state a claim under the False Claims Act.  *See Ge*, 737 F.3d at 124 (stating that the court "reject[s][the] approach" sought by the relator, which was "a per se rule that if sufficient allegations of misconduct are made, it necessarily follows that false claims and/or material false information were filed").  Rather, the complaint must allege both the existence of a scheme and the making of particular false claims resulting from the scheme.

Here, the complaint describes in general terms how claims are submitted to Medicare and Medicaid; it describes the various ways in which FMCNA allegedly paid kickbacks for referrals;

and as to each such aspect of the scheme, it alleges that "every" claim or "all" claims were fraudulent.

### a.    General Description of Medicare and Medicaid Claim Systems

First, the complaint alleges in general terms that all claims for reimbursement made to Medicare require the submission of a Form UB-40 (or a substantially similar form) that contains "various data, including the patient's identifying information and line items for each claim sought to be reimbursed."  (Am. Compl. ¶ 29).  It includes a blank example of such a form as Exhibit A.  (*Id.* Ex. A).  It further alleges that defendant is required to submit on an annual basis a Form 265 cost report to Medicare that certifies, among other things, that the services identified in the report (that is, the dialysis services) were provided in compliance with federal law, including the Anti-Kickback Statute.  (*Id.* ¶¶ 30-31).

As to Medicaid, the complaint alleges in general terms that state administrators of the program obtain reimbursement from the federal government by submitting a quarterly Form 64 to the Centers for Medicare and Medicaid Services at Department of Health and Human Services.  (*Id.* ¶ 40).  According to the complaint, "[f]or this reason, claims submitted to the state Medicaid agencies are presented to the federal government within the meaning of the [False Claims Act]."  (*Id.*).

The complaint does not allege, even in general terms, how claims are submitted under the CHAMPUS/TRICARE or CHAMPVA programs.

### b.    Description of False Claims

#### (1)    Hospital Services

As set forth above, the complaint alleges that FMCNA provided dialysis services to hospitals at prices well below cost in order to capture referrals of discharged patients to its

26

dialysis clinics.  (*Id.* ¶ 83).  After describing that scheme in some detail, the complaint alleges the

following as to the submission of actual false claims:

> Fresenius'[s] below-cost acute dialysis services constitute illegal remuneration to
> hospitals, as those services relieved the hospitals of financial obligations they
> otherwise would have incurred in providing inpatient treatment to ESRD patients
> and were provided as an illegal inducement for referrals to its outpatient clinics, in
> violation of the AKS.  *Any claims submitted* for services Fresenius rendered to the
> patients who were referred to Fresenius clinics through the operation of this
> scheme *are false claims within the meaning of the FCA.*

(*Id.* ¶ 127) (emphasis added).

The complaint also provides a somewhat more complete description of the false claims

for services allegedly provided to Scripps Health, "a large health care system with five hospitals

in San Diego, California."  (*Id.* ¶ 154).  As to Scripps, it alleges the following:

> At an average of three treatments per week per patient, those 172 additional
> patients (whose treatments were paid for by Federal health care programs)
> received some 26,832 treatments each year.  Because the average dialysis patient
> stays in treatment for at least five years, the total value of these additional
> referrals to Fresenius during a five-year period from this single hospital system
> exceeded an estimated $30 million.  *Every claim for reimbursement* associated
> with treating these patients that was submitted to Federal health care programs
> was tainted by kickbacks and *constituted a false claim.*

(*Id.* ¶ 165) (emphasis added).

### (2)   Medical Director Compensation

The complaint further alleges, at considerable length, a scheme to pay medical directors

compensation above fair market value in order to induce referrals.  As to the submission of false

claims, it makes the following general allegations:

> . . . Fresenius'[s] compensation of its medical directors cannot be explained by
> competition or market forces.  The difference is also not explained by differing
> duties and responsibilities, because the duties of dialysis clinic medical directors
> are defined by uniform federal regulations.  Instead, at least one (if not the only)
> reason Fresenius pays its medical directors so far above FMV is in order to secure
> referrals.  At least in part because of receiving this above-FMV compensation
> from Fresenius, the medical directors for the foregoing facilities and in the

foregoing cities have referred patients to Fresenius facilities, the majority of whose care was paid for by Federal health care programs. *Every claim submitted* to these programs for reimbursement was tainted by kickbacks and thus *constitutes a false claim* under the FCA.

(*Id.* ¶ 204) (emphasis added).

The physicians who had entered into MDAs referred patients to Fresenius facilities based at least in part on remuneration from Fresenius, and these facilities submitted claims to Federal health care programs for reimbursement associated with the treatment of these patients. *All such claims*, which were tainted by kickbacks, *were false*.

(*Id.* ¶ 229) (emphasis added).

The complaint also describes the compensation paid to a number of specific medical directors around the United States. (*Id.* ¶¶ 232-35 (Diablo Nephrology in California); *id.* ¶¶ 236-41 (Balboa Nephrology Medical Group in California); *id.* ¶¶ 242-55 (NANI in Illinois); *id.* ¶¶ 256-69 (IMN and other practices in Indiana); *id.* ¶¶ 270-84 (ENA and other practices in North Carolina); *id.* ¶¶ 285-91 (practices in Texas); *id.* ¶¶ 292-307 (practices in Washington state)). As to each, it provides some specifics as to the scheme (such as referral trends and medical-director compensation levels). It then alleges, in general terms, that "all" claims from those facilities were "tainted by kickbacks" and therefore constitute false claims within the meaning of the False Claims Act. (*Id.* ¶ 233 (Diablo Nephrology) ("*Every* claim for reimbursement [FMCNA] submitted to [f]ederal health care programs associated with the treatment of these patients was tainted by kickbacks and therefore false within the meaning of the FCA."); *id.* ¶ 238 (Balboa Nephrology Medical Group) ("*Every* claim . . . constitutes a false claim."); *id.* ¶ 249 (NANI) ("*All* . . . claims . . . constituted false claims . . . ."); *id.* ¶ 257 (Indiana) ("*All* such claims . . . were false . . . ."); *id.* ¶ 274 (North Carolina) ("[E]ach of these claims was false . . . ."); *id.* ¶ 284 (North Carolina) ("*All* such claims . . . were false."); *id.* ¶ 286 (Texas) ("*All* such claims . . . were false . . . ."); *id.* ¶ 293 (Washington state) ("*All* such claims . . . were false . . . ."); *id.* ¶ 299

(Washington state) ("*All* such claims . . . were false."); *id.* ¶ 304 (Washington state) ("*All* such claims . . . were false.") (emphasis added)).

As to some of those medical practices, the complaint provides some amount of additional detail, although again it does not describe any specific false claims.

As to Diablo Nephrology, the complaint alleges the following:

> In return for these lucrative remuneration relationships, Diablo Nephrology referred patients to Fresenius clinics, much of whose treatment was paid for by Federal health care programs.  As of August 31, 2012, for example, Diablo Nephrology had 585 patients in dialysis at various Fresenius facilities (including home dialysis patients), out of which only 6.9% were commercial pay patients. The Diablo patients accounted for a total of 104,731 treatments, over 95,000 of which were billed to Federal payers at an average rate of approximately $230 per treatment, or more than $21,000,000 in Medicare reimbursement per year to Fresenius.  Every claim for reimbursement for the treatment of these patients constitutes a false claim.  Diablo Nephrology contributed $4,395,000 to Fresenius' EBIT in 2012.  *Every claim for reimbursement* Fresenius submitted to Federal health care programs associated with the treatment of these patients was tainted by kickbacks and *therefore false within the meaning of the FCA*.

(Id. ¶ 233) (emphasis added).

As to Balboa Nephrology Medical Group, it alleges the following:

> As of 2013, Balboa physicians had referred 2,175 patients for dialysis at Fresenius facilities, an increase of 274 dialysis patients over the previous year.  Fresenius' internal tracking documents show that Balboa's commercial mix was 10.5%, which means that over 1,900 of the patients that Balboa referred to Fresenius clinics were beneficiaries of Federal health benefit programs such as Medicare and Medicaid, whose care was paid for by these programs.  *Every claim for reimbursement* for the treatment of these patients *constitutes a false claim*.

(*Id.* ¶ 238) (emphasis added).

As to NANI, the complaint provides a table of Medicare and Medicaid revenue for a period of five years at seventeen dialysis centers in the Chicago area.  (*Id.* ¶¶ 247-48).  It then alleges:

> *All* of the Medicare and Medicaid claims submitted to these Federal health plans were tainted by the kickbacks Fresenius paid to NANI, which were illegal

remuneration to secure referrals, and violated the AKS.  As such, they *constituted false claims under the FCA*.

(*Id.* ¶ 249) (emphasis added).

Similarly, for North Carolina, the complaint provides a table of Medicaid (but not Medicare) revenue for a period of six years at fourteen dialysis centers.  (*Id.* ¶ 272).  It then provides a table of patients and patient treatments for the same facilities over the same time period.  (*Id.* ¶ 273).  It then alleges:

> Fresenius submitted each of the foregoing hundreds of thousands of claims for reimbursement to Medicaid on approximately 45,756 occasions (3,813 patients x 12 submissions annually).  When Fresenius submitted each claim, it impliedly certified that the corresponding treatments complied with the AKS.  However, all of these treatments were tainted by kickbacks in the form of above-FMV medical director compensation, at least one purpose of which was to induce referrals to Fresenius clinics.  Accordingly, *each of these claims was false within the meaning of the FCA*.

(*Id.* ¶ 274) (emphasis added).

The complaint does not, however, identify a single specific false claim submitted in connection with any of those dialysis centers.

### (3)    Favorable Leases

The complaint further alleges a scheme to provide favorable leases to physician groups in order to induce referrals.  As to the claims arising from that scheme, the complaint alleges the following:

> Through the actions alleged above, including the payment of above-FMV rents and provision of below-FMV leases to physicians in order to induce and secure referrals, Fresenius violated the AKS.  Through these practices, Fresenius essentially paid physicians for referrals, payments that violate the AKS.  *All claims submitted* for services Fresenius rendered to the patients who were referred to Fresenius clinics through the operation of this scheme *are false claims within the meaning of the FCA*.

(*Id.* ¶ 331) (emphasis added).

30

### (4)   Other Aspects of the Scheme

As set forth above, the allegations of the complaint concerning joint-venture agreements, free services to hospitals and patients, and free practice-management services to physicians will be dismissed for failure to comply with the notification and other requirements of the False Claims Act.  In any event, as to those aspects of the alleged scheme, the allegations of the submission of false claims are similarly general.

As to joint-venture agreements, the complaint again alleges in general terms that "all" claims submitted by facilities with joint-venture partners are false claims.

> Not only did Fresenius intentionally enter into JVAs in which its nephrologist partners had greater than forty percent ownership interests, but Fresenius knows, and expects, that the vast majority of revenue for its JV facilities will come from patients referred by these partners.  A significant number of the ESRD patients treated at these facilities were beneficiaries of Federal health care programs, for whose treatment the facilities submitted claims for reimbursement.  Because Fresenius entered into these JVAs based at least in part to induce nephrologists to refer patients to its own clinics, and intentionally violated the strictures set forth in 42 C.F.R. §§ 1001.952(a)(2)(i) & 1001.952(a)(2)(vi), *all of these claims* violated the AKS and *constitute false claims* within the meaning of the FCA.

(*Id.* ¶ 350) (emphasis added).[4]

As to the alleged scheme to provide other services to hospitals, the complaint alleges the following:

> Through the circumstances alleged above, including the provision of services at below cost and at no cost to hospitals in order to induce referrals to its outpatient clinics, Fresenius violated the AKS, which prohibits the payment of remuneration to secure referrals.  Through these practices, Fresenius essentially paid hospitals to secure referrals, in violation of the AKS.  *Any claims submitted* for services Fresenius rendered to the patients who were referred to Fresenius clinics through the operation of this scheme *are false claims within the meaning of the FCA*.

---

[4] The complaint goes on to identify four specific sets of joint-venture arrangements (Balboa, NANI, ENA, and Dallas Nephrology Associates) and again alleges that "all claims" submitted in connection with patients treated by those physicians or facilities were "tainted by kickbacks" and therefore false.  (Am. Compl. ¶¶ 353, 357 (Balboa); *id.* ¶ 359 (NANI); *id.* ¶ 360 (ENA); *id.* ¶ 361 (Dallas Nephrology Associates)).

(*Id.* ¶ 166) (emphasis added).

As to the scheme to provide free or below-cost practice-management services, the complaint alleges the following:

> Through the valuable free practice management services provided to physicians they would otherwise have to pay themselves, Fresenius violated the AKS, which prohibits the payment of remuneration to secure referrals.  *All claims Fresenius submitted* for services Fresenius rendered to the patients who were referred to Fresenius clinics through the operation of this practice management scheme *are false claims within the meaning of the FCA.*

(*Id.* ¶ 320) (emphasis added).

### 3.    <u>Analysis</u>

As noted, despite its length and detail, the description of the fraudulent scheme set out in the complaint, without more, is insufficient to state a claim under the False Claims Act.  There must be particularized allegations of claims for payment arising from that scheme.  "Evidence of an actual false claim is the *sine qua non* of a False Claims Act violation."  *Karvelas*, 360 F.3d at 225.  And under Rule 9(b), those claims must be described with some level of specificity.  *See id.* at 233.   The question here is whether the complaint has met that standard.

To begin, it appears—although the complaint is ambiguous at times—that the Medicare claims at issue were submitted to the federal government by FMCNA itself, and that the Medicaid claims were submitted by various state government agencies based on claims that FMCNA submitted to those agencies.[5]  As to the Medicare claims, therefore, the complaint must be evaluated according to the ordinary standard applicable in False Claims Act cases, not the "more flexible" standard applicable where the defendant allegedly caused a third party to submit false claims.  *See Kelly*, 827 F.3d at 13.  For the sake of simplicity, the Court will focus first on

---

[5] Among other things, the complaint uses the passive voice throughout:  claims "were submitted," rather than "FMCNA submitted claims."

the Medicare claims.[6]

In substance, the complaint alleges the FMCNA created a nationwide scheme to pay unlawful kickbacks for referrals at all of its outpatient dialysis facilities; that all claims submitted for all dialysis services are therefore tainted by kickbacks; and that therefore every claim submitted by FMCNA during the relevant period was false. If relator is correct, that means that the entire government-payor business of FMCNA—which appears to amount to more than $10 billion in revenue per year—is based on fraud. And it means that relator stands to reap a reward of 15%-30% of any recovery—an amount that might well be measured in tens of billions of dollars.

There is, of course, considerable logic to relator's arguments: if 100% of the business of FMCNA is tainted by kickbacks, and if 80% or more of the business of FMCNA involves government payors, it follows that FMCNA must have submitted many false claims. But whatever the merits of that argument may be, the law requires more. *See Kelly*, 827 F.3d at 15 ("It may not be irrational to infer that, given [the allegations of the fraudulent scheme], some false claims . . . for reimbursement were submitted to the government. But this is not enough to satisfy Rule 9(b).").

Again, the complaint does not identify a single specific false claim—by Form UB-40, by patient name, by date, by location, by dollar amount, by billing code, by type of service, or otherwise. Nor does it provide any representative or sample claims.[7]

Complicating matters further is the nature of the alleged false claims. There is no

---

[6] As noted, there are no allegations at all concerning the payments of claims under the CHAMPUS/TRICARE or CHAMPVA programs.

[7] That may, in part, be a result of the fact that relator did not work in any financial or billing capacity, but rather worked as the Director of Acute Market Development for the Fresenius Western Business Unit, and negotiated contracts between FMCNA and hospitals for in-patient dialysis treatment. (Am. Compl. ¶ 11).

contention that any dialysis services performed were medically unnecessary or excessive, or that those services were performed in a substandard manner.  Nor is there any contention that any dialysis services that were paid by Medicare in fact should have been paid by a private payor.  Based on the allegations of the complaint, it appears that all of the patients in question would have received treatment at a facility operated by FMCNA or a competitor, and all of those treatments would have been paid by Medicare regardless.  It appears, therefore, that the government may have suffered little or no actual financial loss.  The entire basis of the complaint is a theory of tainted referrals; kickbacks paid by FMCNA tainted the physician-referral process, which enabled the company to obtain, unlawfully, a larger share of referrals than it would have otherwise in a properly functioning market.

It is true that a violation of the Anti-Kickback Statute "that results in a federal health care payment is a *per se* false claim."  *Guilfoile*, 913 F.3d at 190.  It does not follow, however, that where there is an AKS violation, the requirement of establishing a false claim evaporates.  One problem lies in the phrase "results in"—that is, the requirement of causation.  Suppose, for example, that in a world free from kickbacks, 25% of the dialysis services business of FMCNA would have been captured by competitors.  Rule 9(b) requires that a relator plausibly allege that specific payments concerning specific patients were caused by the AKS violation—that is, that they were part of the 25% of the claims that resulted from a violation, not the 75% that were not.  Relator here has not attempted to do so.

Certainly it would not be irrational to conclude that the presence of kickbacks taints the entire payment process, so that 100% of the claims may be deemed to have been caused by the violation.  No published case in the First Circuit, however, has ever gone so far.  It might also be entirely rational to shift the burden to the defendant:  that is, once a relator has established the

34

existence of a kickback scheme, arguably the burden should be shifted to the defendant to prove that certain referrals were not caused by payment of kickbacks.  Again, however, no case, to the Court's knowledge, has ever established such a procedure.

In any event, as noted, the complaint does not include a single allegation concerning a single specific false claim.  To avoid dismissal, the complaint must therefore establish the necessary degree of particularity, if at all, through allegations of "factual or statistical evidence that strengthen[ ] the inference of fraud on the government beyond a mere possibility." *Duxbury I*, 579 F.3d at 29.

To the extent the complaint here provides any factual or statistical evidence as to the actual false claims, it does so by alleging in a handful of instances that certain types of claims associated with patients at certain facilities were false.  The complaint alleges that certain medical practices, such as Diablo and Balboa, benefited financially from medical-director agreements and joint-venture agreements with FMCNA, that in return they referred patients to FMCNA facilities, and as a result all of their claims for government reimbursement were false. Each step in that argument relies on an inference:  first, the inference that the relevant financial arrangements were intended as kickbacks; second, the inference that every referral to an FMCNA clinic was made as a result of the kickbacks; and third, the inference that every claim for government reimbursement was tainted by the kickbacks.  But nowhere does the complaint identify a specific physician who made a specific referral as a result of a specific unlawful practice that resulted in a specific false claim.  In substance, it is a dressed-up version of a generalized allegation:  it essentially alleges that if a practice benefited financially from a relationship with FMCNA, and if it administered 104,000 treatments, and 93% of those were to patients who were beneficiaries of government-sponsored healthcare programs, then it submitted

96,720 false claims.  That is not sufficient, under the case law, to state a false claim with particularity within the meaning of Rule 9(b).

To be clear, the dispositive question is not whether FMCNA engaged in an illegal and pervasive scheme to pay kickbacks for referrals.  For present purposes, the Court must assume that it did.  Nor is the issue whether the scheme should, in some fashion, be redressed.  The government had an opportunity to intervene if it chose, and elected not to do so.  And, presumably, it has other weapons in its arsenal for dealing with fraudulent conduct.  The critical question is whether the complaint meets the exacting standard for FCA claims required by law.  Under the circumstances, the Court concludes that it does not.

In summary, the amended complaint fails to state allegations of fraud under the FCA with the particularity required by Rule 9(b).  Accordingly, the motion to dismiss will be granted.

### E.    **Conspiracy**

Because the complaint does not state allegations of fraud under the FCA with the particularity required by Rule 9(b), the conspiracy claim under the FCA must fail as well.

## V.    **Conclusion**

For the foregoing reasons, defendant's motion to dismiss is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  December 2, 2022                    Chief Judge, United States District Court

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES ex rel. MARTIN FLANAGAN, | ) ) ) ) | |
| Plaintiff-Relator, | ) ) | |
| v. | ) ) ) | Civil Action No. 21-11627-FDS |
| FRESENIUS MEDICAL CARE HOLDINGS, INC., d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA, | ) ) ) ) ) | |
| Defendant. | ) ) ) | |

ORDER ON RELATOR'S MOTION FOR LEAVE TO
FILE A SECOND AMENDED COMPLAINT

SAYLOR, C.J.

I.     **Background**

Relator filed this *qui tam* action against defendant Fresenius Medical Care Holdings, Inc.,

d/b/a Fresenius Medical Care North America on March 6, 2014, in the District of Maryland.  On

June 24, 2020, the government filed notice that it declined to intervene.  The matter was then

unsealed, and relator served the complaint on defendant.

Defendant moved to dismiss on multiple grounds, including the failure to plead false

claims with particularity.  In response, on February 5, 2021, relator filed an amended complaint.

On March 5, 2021, defendant again moved to dismiss, again raising the issue of failure to

plead false claims with particularity.  The District Court in Maryland did not rule on that motion,

but instead transferred the matter to this court on October 5, 2021.

On January 21, 2022, defendant filed a third motion to dismiss, again raising the issue of

37

failure to plead false claims with particularity.  On May 23, 2022, after extensive briefing, this Court heard oral argument on the motion.

On December 5, 2022, the Court issued a memorandum and order dismissing the complaint on a number of grounds, including failure to state allegations of fraud under the False Claims Act with the particularity required by Fed. R. Civ. P. 9(b).

Relator has now moved, pursuant to Fed. R. Civ. P. 15(a)(2), for leave to file a second amended complaint seeking to cure the deficiencies identified by the Court.  Relator purports to have obtained "new evidence" in the form of Medicare "claims data" from an unidentified "private company" in response to that memorandum.

## II.   <u>Analysis</u>

This case is now nearly nine years old.  It should have been obvious from the beginning that relator would be required to prove that false claims were submitted to the government, and that those claims would have to be proved with particularity under Fed. R. Civ. P. 9(b).  *See, e.g.*, *United States ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 123-24 (1st Cir. 2013) (holding that false claims must be pleaded with particularity).  Indeed, defendant filed three different motions to dismiss, all of which raised that very issue.

In response to one of those motions, relator filed an amended complaint seeking to cure the deficiencies.  That, normally, is a permissible response.  What is not permissible is waiting for the court to rule, and then seeking to cure the deficiencies, if any, pointed out in the court's opinion.  At a minimum, that is a practice that the First Circuit "wish[es] to discourage."  *Fire & Police Pension Ass'n of Colorado v. Simon*, 778 F.3d 228, 247 (1st Cir. 2015); *see United States ex rel. Hagerty v. Cyberonics, Inc.*, 146 F. Supp. 3d 337, 344 (D. Mass. 2015) ("The practice of waiting to amend a complaint until after the Court has ruled on a motion to dismiss is

38

troublesome, to say the least."), *aff'd*, 844 F.3d 26, 34-35 (1st Cir. 2016).  As this Court has

observed:

> The Court does not sit as a sort of "super-lawyer," here to correct counsel's errors and omissions, or to provide a roadmap as to how to draft a proper complaint.  Nor are plaintiffs allowed to treat their original complaints as "risk-free trial balloon[s]" with the expectation that the Court will grant leave to amend after it dismisses their claims.  A party that decides to hold back and await a ruling on a motion to dismiss should not be placed in a better position as a result.  To rule otherwise would encourage poor lawyering, waste valuable court resources, and prejudice opposing parties.

*Rowayton Venture Grp. LLC v. McCarthy*, 2020 WL 6136377, at *3 (D. Mass. Oct. 19, 2020)

(citation omitted).

Here, the Court spent considerable time and resources reviewing the record, considering

the briefs of the parties and the legal authorities cited, and preparing a memorandum and order

that ultimately ran to 36 pages.  If the Court's judgment is incorrect, it can of course be

overturned by the Court of Appeals.  But surely the purpose of that exercise was not simply to

prod relator's counsel into seeking out additional evidence to try to bolster his claims.  If nothing

else, the extensive delays, and obvious prejudice to defendant, are sufficient reasons to deny the

motion to amend under Fed. R. Civ. P. 15(a)(2).

III.   **Conclusion**

For the foregoing reasons, Relator's Motion for Leave to File a Second Amended

Complaint is DENIED.

**So Ordered.**


                                                    /s/ F. Dennis Saylor IV
                                                    F. Dennis Saylor IV
Dated:  March 1, 2023                               Chief Judge, United States District Court

39